Filed by ___ OTS ___ D.C.

ELECTRONIC

**Feb. 12, 2010**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO._____

CAREY CHEN,                    **10-CV-80236-Cohn/Seltzer**

   PLAINTIFF,

v.

CAYMAN ARTS, INC., a Florida corporation,
and SCOTT R. STEELE, an individual,

   DEFENDANTS.
_____/

### COMPLAINT

Plaintiff, Carey Chen ("Chen"), sues Cayman Arts, Inc. ("Cayman Arts"), a Florida

corporation, and Scott R. Steele ("Steele"), individually, and states:

### Jurisdiction, Parties and Venue

1.     This action is brought and subject matter jurisdiction lies with this Court pursuant

to Title 28 U.S.C. §1331 and 1338 and by Title 29 U.S.C. §216(b).  The Court has supplemental

jurisdiction of the remaining state law counts based upon Florida common law pursuant to 28

U.S.C. § 1367(a) as the remaining claims arise from the same nucleus of operative facts as the

federally derived claims referenced above.

2.     The Plaintiff, Chen, is a renowned marine life artist, who has spent his lifetime

cultivating his gift for artistic endeavors and establishing himself as a premier artisan in the field.

Chen is an individual who maintains a residence in Palm Beach County, Florida.

3.     The Defendant, Cayman Arts, is a Florida corporation, with its principal place of

business being 155 East Blue Heron Blvd Suite R-5, Riviera Beach, FL 33404.  Cayman Arts

1

regularly conducts business in Palm Beach County, Florida.  Cayman Arts is controlled and dominated by its principal, Steele.

4.     The Defendant, Steele, is an individual and maintains a residence in Maryland. Steele is the owner and principal of Cayman Arts.  Steele also owns several residential properties in Palm Beach County.

5.     This Court has personal jurisdiction over Steele and Cayman Arts because, among other things, Steele and Cayman Arts transact business in this district, they maintain systematic and continuous contact within Florida, including, but not limited to, by advertising, promoting, marketing, selling, and/or offering for sale their products in Florida.  Steele committed one or more torts in the State of Florida, the effects of which were experienced in the State of Florida.

6.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. §1391(b) and (c) in that, among other things, Defendants reside or conduct business, and are subject to personal jurisdiction in this District.  Further, a substantial part of the events in which Plaintiff's claims are based occurred in the Southern District of Florida.

## GENERAL ALLEGATIONS

7.     Steele and Chen were long-time friends and they fished together for many years prior to the inception of Cayman Arts.

8.     Through his realistic marine life paintings, murals and other inspiring original works, Chen has developed a reputation as a leading marine life (angler) artist. His work was, and remains, in great demand and Steele was well aware of Chen's reputation for his artistic endeavors in the fishing and boating community.

9.     In the course of their friendship, Chen told Steele about the companies that he worked with, including Cayman Arts, LLC and Cayman Arts, LTD.

2

10.     Steele became interested and, sometime in 2004, Steele purchased Cayman Arts LLC and Cayman Arts, LTD (the "Companies").

11.     After Steele purchased the Companies, on or about September 2004, Steele established Cayman Arts, Inc.  See Exhibit A.

12.     Steele established Cayman Arts with the express purpose of "selling angler artwork and products (i.e. shirts, hats, bags, etc.)."  See Exhibit A.

13.     The artwork and other angler products were to be designed by Chen.

14.     Therefore, sometime on or about September 2004, Cayman Arts, through Steele, hired Chen and classified him as a full-time, salaried exempt employee of Cayman Arts.  A copy of his Employment Agreement is attached as Exhibit B.

15.     At all times material, Steele was the president and only director of Cayman Arts and made all decisions made by or on behalf of Cayman Arts.

16.     As part of his employment with Cayman Arts, Steele decided that Chen was to be paid an annual salary of $81,000.

17.     At the time Steele purchased the Companies, and before Chen was employed, Steele made many promises and representations to Chen regarding Chen's future and the future of Cayman Arts.  Steele promised and represented that he would actively promote Chen and Cayman Arts raising Chen's visibility as a renowned artist further and causing an increase in the sales and price of Chen's artwork.

18.     Steele also promised and represented to Chen that he would be opening an office and gallery in Palm Beach County for Cayman Arts that would also serve as an art studio for Chen.

19.     Steele and Cayman also stated that they would grow the business to a size so large

3

that it would require numerous employees to operate the business.

20.     Steele and Cayman also promised and represented to Chen, as an inducement to the employment, that Steele and Cayman could make them all large amounts of money by selling Chen's artwork.

21.     In fact, Steele and Cayman promised and represented to Chen that Steele would invest significant money into Cayman Arts because Steele's company (Steelesoft) had recently been awarded an extremely large judgment (approximately 276 million dollars) against First Union and he had more than sufficient funds to do so.

22.     In connection with Chen being hired by Cayman Arts, Steele sent to Chen in Florida, three (3) documents ("Agreements") for Chen to sign:

  a)  "Employment Agreement" ("Employment Agreement"); See Exhibit "B" to this Complaint;

  b)  "Addendum to Agreement" ("Addendum"); See Exhibit "C" to this Complaint; and

  c)  "Exhibit B Trademark and Product License Agreement" ("Licensing Agreement"); See Exhibit D to the Complaint.

23.     Chen, an artist without a formal business background, relying on promises and representation made by Steele and Cayman Arts, trusting that Steele was his friend, was a good businessman, and had sent him fair documents, signed the documents in Florida without any legal representation and mailed them back to Steele.

24.     The Agreements, inter alia, provided that he would receive a percentage of all profits over $100,000 (the "Profits").  Steele promised and represented that profits would exceed that amount annually.

4

25.    With the exception of the Profits, at no time did Steele discuss with Chen the documents or any other terms contained in the documents. No effort was made to explain to Chen what the documents were otherwise intended by Steele to do.

### Cayman Arts Ongoing Operations

26.    After Steele established Cayman Arts, Steele delegated the search for a headquarter/office location in Palm Beach County to another employee of Cayman Arts, Patrick Galvin ("Galvin").

27.    Galvin identified numerous properties that would have been suitable, in space and location, for the headquarters of Cayman Arts.

28.    Each time Galvin presented a location to Steele, Steele chose to enter into protracted lease negotiations that did not come to fruition.

29.    Steele's conduct in procrastinating and delaying became a pattern of conduct by Steele.

30.    It took two (2) years for Steele to finally agree to the lease terms for a location for the headquarters for Cayman Arts.  Such actions prevented Chen from having a gallery and studio in which to work and showcase his art and served to sabotage Chen's ability to earn additional profits in those years due to immense time wasted.

31.    The location selected by Steele (the "Location") was too small for the Cayman Arts operations, and not a practical location for the nature, type and quality of Chen's artwork.

32.    For example, the Location was too small for the previously promised gallery of Chen's artwork and creations.

33.    Additionally, the Location was so small and so impractical that no more than two (2) or three (3) employees were able to be present and working in the facility at the same time.

## Cayman Arts Failure to Market and Promote Chen and his Artwork

34.     Steele, on behalf of Cayman Arts, promised Chen that he and Cayman Arts would work with Chen to actively promote his artistic works.

35.     However, Steele and Cayman Arts failed miserably in their obligation to promote Chen's works.

36.     Instead, incredibly, Steele inhibited and blocked numerous valuable opportunities at home and abroad offered to Chen by third parties to promote his work.

37.     For instance, but without limitation to the many squandered opportunities by Steele, Chen was approached by Wayne Bisbee ("Bisbee") of Z.G. Collections (an entity that owns the rights to certain Zane Grey manuscripts) who asked Chen to illustrate several Zane Grey manuscripts about fishing and the seas.[1]

38.     Z.G. Collections did not require any financial investment or expense by Cayman Arts other than Chen's time and materials.   Chen was ready, willing and able to meet the obligations of the proposed Z.G. Collections project.

39.     Chen presented the project to Scott Steele who proceeded to enter into protracted negotiations with Bisbee regarding the contract for Chen's services.

40.     Because the publishing date for the manuscripts was in just a few weeks, Chen began designing the illustrations for the manuscripts including the book jacket and art to appear through the publication.

41.     Steele, however, made unrealistic demands of Z.G. Collections, intended and having the effect, again, to sabotage and frustrate the deal.

---

[1] Zane Grey was an American author best known for his popular adventure novels and stories about the old west and fishing. Many of his works have become well known American classics and movies.

6

42.     For example, Steele demanded that Z.G. Collections include in the contract a provision that would entitle Cayman Arts to 2.5% of the sale price of the entire Z.G. Collections company should Z.G. Collections ever be sold.

43.     Such a demand was absurd because Z.G. Collections had many more publications and products than just the few manuscripts to be illustrated by Chen.  Such a provision was not standard in the industry in any event.

44.     Steele's protracted negotiations and unrealistic demands led to the demise of the deal with Z.G. Collections.

45.     The failure of the Z.G. Collections deal represented a lost opportunity to promote and publish Chen's works on an international scale.

46.     A second example (but in no way a limitation of Steele's many squandered opportunities) of Steele's failure to fulfill his obligations involved an offer by Ocean World ("Ocean World") in the Dominican Republic for Chen to design and paint a grand mural on an approximately 100 foot wall located in the marina at the resort.

47.     Ocean World requested the mural completed prior to its grand opening events held on December 16, 2006.  Chen was ready, willing and able to provide the work requested within that time frame.

48.     Ocean World offered to pay all costs associated with the performance of Chen's services including travel, lodging, and meals.

49.     When Chen told Steele about the extraordinary offer, Steele demanded that Ocean World pay $250,000 for the mural.

50.     Ocean World, in turn, offered, generously, to pay approximately $130,000 plus expenses for the commission of the mural.

7

51.     Steele, stubbornly and without reason or justification, refused the deal offered by Ocean World thereby preventing Chen from painting the mural.  Steele's continued refusal to promote Chen's work and prevent profitable endeavors was entirely at odds with Steele's initial representations and the duties set forth in the parties' Agreements.

52.     Steele's irrational and unjustified refusal to allow the commission for Chen's work at Ocean World denied Chen of a prime and important opportunity to display his artwork on an international scale.

53.     The grand opening party at Ocean World was attended by invited guests from around the world along with government officials and dignitaries.

54.     Moreover, Ocean World attracts tourists from around the world thereby providing an international stage for the exposition of Chen's artwork.

### Post Employment Interference and Bad Faith by Steele

55.     On July 22, 2009, Chen flew to Baltimore, Maryland (at his own expense) and personally resigned from his position with Cayman Arts, thus terminating the Employment Agreement (Exhibit A) as amended. Chen could not continue to work for an employer who not only continuously failed to live up to the terms of the parties' Agreements, but outwardly appeared to be trying to work against Chen's interests.

56.     Chen also later provided written notice confirming his resignation of employment. See Attached Exhibit E.

57.     Because Chen agreed to accommodate Cayman Arts through a transition period following his termination, Chen's last day of employment with Cayman Arts was October 8, 2009.

58.     Under no set of circumstances could Cayman Arts claim: a) any right in or to any

8

works of Chen created after the termination of the Employment Agreement; or b) any right to bind Chen to any ongoing relationship for the performance of services such as commissions, etc. Accordingly, Cayman Arts and Steele were required to cease and desist from holding themselves out as continuing to be in a business relationship with Chen.

59.    However, without any legal right to do so or authority from Carey Chen, Cayman Arts continues to operate its company and hold itself out to the world as if Carey Chen was still an employee of Cayman Arts.

60.    Cayman Arts continues to operate its website under the website address www.careychen2.com.

61.    Cayman Arts also continues to use Chen's picture on its website.  A copy of which is attached hereto as Exhibit G.

62.    All of Chen's work continues to be displayed in Cayman Arts' website as if it was Carey Chen's official website.  (See Exhibit G.)  It states

> "Welcome to the Carey Chen collection.   You are about to experience the awesome artwork of one of the world's most talented and learned artist in the marine industry.   Carey relies on his extensive experience at sea and his unique use of colors to capture even the minute details yielding some of the most powerful and realistic scenes ever created on canvas."

The website continues to show Carey Chen in the act of creating his artistic renderings and includes an art gallery, listing for tile art, inventory of T-shirts, inventory of available cutting boards, and ostensibly offers up Chen to perform individual commission and custom home designs.  See Exhibit G.

63.    Inexplicably, Cayman Arts continues to represent to the public that Chen remains an employee of the company and that the public needs to deal with Carey Chen through Cayman Arts.

64.     For example, on the Cayman Arts website under the "Commissions" tab on the website, it states: "contact us now to schedule your commission" intentionally misrepresenting that Chen remains an employee and available to do commissions for customers.

65.     Cayman Arts continues to misrepresent Chen as a current employee of Cayman Arts is its listing at the 2010 Miami Boat Show, which reads: "Carey Chen/Cayman Arts, Inc."

66.     Since Chen's employment has ended, he has participated in fishing tournaments and has begun creating new artwork.

67.     Chen has not, in any way, distributed, showed, sold, or otherwise exhibited any artwork created during the time that he was an employee of Cayman Arts.

68.     However, since the end of Chen's employment with Cayman Arts, Steele and Cayman Art have called organizations and companies with which Chen conducts business and have insisted that those companies and organizations pay Cayman Arts for any work created by Chen after his employment ended with Cayman Arts.

69.     Specifically, Chen holds a volunteer position on a committee of the Miami Boat Show.

70.     As part of his volunteer services for the Miami Boat Show, Chen created new logos and artwork to be used in 2010.

71.     Chen created the artwork for the Miami Boat Show after he left his employment with Cayman Arts.

72.     In exchange for Chen's volunteer services, the Miami Boat Show provides Chen with a booth at the show.

73.     Steele and Cayman Arts contacted the Miami Boat Show and insisted that Chen was not entitled to a booth at the 2010 event, interfering with Chen's rights to continue to pursue

his talents.

74.     Steele and Cayman Arts also insisted that the Miami Boat Show was not entitled to use the artwork that Chen developed (post-employment) for the 2010 event.

75.     Additionally, Chen also provided new artwork to the Ocean Reef Club for an emergency commission in December 2009 (also post-employment).

76.     Steele and Cayman Arts contacted the Ocean Reef Club and demanded that it pay Cayman Arts for the artwork that Chen provided to it in December 2009, even providing a manufactured invoice in further perpetuation of this sham.

## COUNT I – BREACH OF CONTRACT

77.     The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

78.     On or about May 20, 2005, Cayman Arts and Chen entered into the Employment Agreement, Addendum to Agreement ("Addendum"), and Trademark and Product License Agreement ("Licensing Agreement") (hereinafter collectively referred to as the "Agreements"), each with an effective date of September 1, 2004.

79.     Paragraph 7 of the Licensing Agreement, entitled Duties and Responsibilities: Best Efforts, provides, in pertinent part:

> Both Parties shall cooperate with each other and use their **best efforts** in connection with the distribution, sale and offering for sale of the Licensed Products in order to maximize sales of the Licensed Products. **Such best efforts shall be exerted to develop, produce and market** the Licensed Products on and/or in connection with which Licensee may use such Licensed Products, Trade Marks and Works, and to build an association with any other products on or in connection with which Licensor may use such Licensed Products, Trade Marks and Works, thereby establishing a total marketing package in which each item thereof compliments each other item thereof. (emphasis supplied).

11

80.     Paragraph 2 of the Addendum to the Employment Agreement, entitled Other Potential Compensation, provides, in pertinent part:

> 2(a)    Bonus from Net Annual Profit.  Employee shall be entitled to receive twenty (20) percent in Bonus from Net Annual Profit ("Bonus from Profit") only on annual Net Profits that exceed $100,000 (if realized) from the Net Sales of the Corporation's Licensed Products or Product Marks sold directly by the Corporation or sold through an authorized licensee.

81.     Subsequent to the execution of the Agreements, and throughout the course of the Chen's employment, Cayman Arts, through Steele, repeatedly exhibited a course of conduct whereby Cayman Arts would delay, interfere with, and effectively sabotage numerous potentially lucrative and high profile projects offered to Chen, including but not limited to, the Ocean World project and the illustrations for the Zane Grey manuscripts discussed in greater detail above.

82.     These projects, among others, would have greatly increased the general public's exposure to Chen and his artwork, and would have greatly increased revenues for Cayman Arts (at little or no expense to Cayman Arts).

83.     Had Cayman Arts used its "best efforts" to promote, distribute, sell and offer for sale Chen's artwork and services, as it was required to do pursuant to the Agreements, Cayman Arts would have approved the taking on of these projects and would have increased Chen's chances of earning a bonus under the Employment Agreement (i.e. 20% of net profits over $100,000).

84.     Instead, Cayman Arts used virtually no efforts to allow Chen to increase his sales and price of his work and unreasonably prevented Chen from taking on large projects of great significance.

12

85.     Further, it is Chen's belief that Steele may have used Cayman Arts for his personal purposes for which he derived personal benefit to the economic disadvantage of Chen.[2].

86.     Cayman Arts has breached the Licensing Agreement with respect to the performance of its duties and obligations to Chen.

87.     As a legal and proximate cause of Cayman Arts' breach of the Licensing Agreement, Chen has suffered damages.

**WHEREFORE,** Plaintiff, Chen, respectfully requests that this Court enter judgment for damages against Defendant, Cayman Arts, with costs, interest and such other and further relief as the Court deems just and proper, and trial by jury on all issues so triable.

## COUNT II –
## LANHAM ACT CLAIM – §15 U.S.C. 1125(a)(1)
## ("FALSE DESIGNATION OF ORIGIN")

88.     The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

89.     Chen has spent considerable time and money developing a reputation as a first class marine artist.

90.     Chen has similarly invested considerable time and money in promoting his name and artwork.

91.     These efforts have included but are not limited to attending fundraisers and charitable events, attending boat shows, publishing materials, print advertising, and advertising in electronic media including the internet.

---

[2] In fact, throughout Chen's employment, from September 2004 through October 2008, Chen was never given a percentage bonus for net profits over $100,000. According to Cayman Arts, it is because the $100,000 net profit threshold was never achieved, however, Cayman Arts denied Chen's repeated requests to look at Cayman Arts' financial statements as verification of the corporation's net profits. Cayman Arts has never provided Chen with an accounting.

92.    As the result of these extraordinary efforts and his talent, Chen's name has obtained a secondary meaning associated with the provision of his artwork and other services.

93.    The consuming public has come to know and accept Chen as a top notch marine artist and among the best in his field.

94.    Consequently, Chen's name qualifies as a trademark under the Lanham Act.

95.    Beginning sometime in October 2009, subsequent to Chen's resignation from Cayman Arts, Cayman Arts has attempted to create the impression that Chen is still involved with Cayman Arts and that Chen's new artwork, created post-resignation, belongs to Cayman Arts.

96.    Cayman Arts has done so by continuing to utilize the name and likeness of Chen on Cayman Arts' website.  (See Exhibit G.)

97.    In fact, the website address itself, www.careychen2.com, is intended to generate the appearance that Chen is still associated with Cayman Arts.

98.    A picture of Chen is prominent on the front page and information on recent Chen activities appear when one activates the "News" link on the website, even Chen's most recent activities in January/February 2010 (post-termination of employment).

99.    The website also advertises that the "Carey Chen Collection" will have a booth at the Boat Show. However, Cayman Arts' listing on the 2010 Miami Boat Show website reads: "Carey Chen/Cayman Arts, Inc."

100.    This conduct is misleading to the consuming public because it creates a misimpression that Chen is still associated with Cayman Arts, that clients who hire Cayman Arts will obtain Chen's services, that the successes of Chen, post employment, are the successes of Cayman Arts, and that the resources and talent of Chen are available to Cayman Arts.

101.    Cayman Arts, through its use of the mark of Chen, is intentionally attempting to confuse the consuming public into believing Cayman Arts is the source of Carey Chen artwork.

102.    The misappropriation and infringement of Chen's name is intentional, wanton, and egregious and is highly likely to cause confusion among the consuming public regarding the source of services being provided by Cayman Arts.

103.    Chen and Cayman Arts provide virtually identical services in the same market, using similar methods of advertising.

104.    Upon information and belief, it is Cayman Arts' intent to gain a competitive advantage by the use of Chen's trademark, and actual confusion among the consuming public has occurred.

**WHEREFORE**, the Plaintiff, Chen, respectfully requests that this Court enter a temporary and permanent injunction prohibiting further use of his trademark, judgment for damages against Chen including attorneys fees and costs, interest and such other and further relief as the Court deems just and proper, and a trial by jury on all issues so triable.

**COUNT III -**
**UNFAIR AND DECEPTIVE TRADE PRACTICES**
**PURSUANT TO F.S. § 501.201 ET. SEQ.**

105.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

106.    Chen has spent considerable time and money developing a reputation as a top-end marine artist.  Chen has similarly invested considerable time and money in promoting his name and artwork.

107.   As the result of his marketing efforts and his attempts to promote himself as a first rate marine artist, Chen has become a well known and respected marine artist whose name and likeness have considerable commercial value and goodwill.

108.   Beginning sometime in October 2009, subsequent to Chen's resignation, Cayman Arts has attempted to create the impression that Chen is still involved with Cayman Arts and that Chen's new artwork, created post-resignation, belongs to Cayman Arts.  (See Exhibit G.)

109.   Cayman Arts' website is replete with references to Chen and presents the misimpression that he is synonymous with Cayman Arts.

110.   Cayman Arts has done so by continuing to misuse the name and likeness of Chen on Cayman Arts' website.

111.   In fact, the website address itself, www.careychen2.com, is intended to generate the appearance that Chen is still associated with Cayman Arts.

112.   A picture of Chen is prominent on the front page and information on recent Chen activities appear when one activates the "News" link on the website, even Chen's most recent activities in January/February 2010 (post-termination of employment).

113.   The website also advertises that the "Carey Chen Collection" will have a booth at the Boat Show. However, Cayman Arts' listing on the 2010 Miami Boat Show website reads: "Carey Chen/Cayman Arts, Inc."

114.   This conduct is misleading to the consuming public because it creates a misimpression that Chen is associated with Cayman Arts, that clients who hire Cayman Arts will obtain Chen's services, that the successes of Chen, post employment, are the successes of Cayman Arts, and that the resources and talent of Chen are available to Cayman Arts.

115.    Cayman Arts, through its use of the mark of Chen, is attempting to confuse the consuming public into believing Cayman Arts is the source of Carey Chen artwork.

116.    As a legal and proximate result of the conduct of Cayman Arts and its agents, Chen has suffered lost reputation, has lost business good will and profits, and has been otherwise damaged.

117.    Such conduct has caused and continues to cause irreparable harm and damage to Chen.

**WHEREFORE**, the Plaintiff, Chen, respectfully requests that this Court enter a temporary and permanent injunction prohibiting the use of the Cayman Arts website, judgment for damages against the Cayman Arts, in addition to attorneys' fees and costs, interest and such other and further relief as the Court deems just and proper, and a trial by jury on all issues so triable.

### COUNT IV -
### MISAPPROPRIATION OF NAME AND LIKENESS
### PURSUANT TO F.S. 540.08

118.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

119.    Cayman Arts continues to publish and display Chen's name and likeness on its website for the purpose of trade and commerce.  (See Exhibit G.)

120.    Since his resignation from Cayman Arts, Chen has never consented to the use of his name and likeness by Cayman Arts for any purpose, including but not limited to the promotion of Cayman Arts' business.

121.    The unauthorized use of Chen's name and likeness is a violation of F.S. § 540.08(1) and Cayman Arts has been the legal and proximate cause of damage to Chen.

122.     Such improper conduct by Steele and Cayman Arts has caused and continues to cause irreparable harm and damage to Chen.

123.     Moreover, pursuant to F.S. § 540.08(2), Chen is entitled to a reasonable royalty for the use of his name and likeness.

**WHEREFORE**, the Plaintiff, Chen, respectfully requests that this Court enter an temporary and permanent injunction prohibiting further use of his name and likeness by Cayman Arts and Steele, judgment for damages against Cayman Arts, including a reasonable royalty, attorneys fees and costs, interest and such other and further relief as the Court deems just and proper, and a trial by jury on all issues so triable.

## COUNT V -
## UNFAIR COMPETITION

124.     The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

125.     Cayman Arts continues to publish and display Chen's name and likeness on its website for the purpose of trade and commerce.

126.     Since his resignation from Cayman Arts, Chen has never consented to the use of his name and likeness by Cayman Arts for any purpose, including but not limited to the promotion of Cayman Arts' business.

127.     The unauthorized use of Chen's name and likeness is a deceptive and fraudulent practice by Cayman Arts which is likely to cause customer confusion.

128.     Cayman Arts has knowingly and intentionally caused this customer confusion by intentionally using Chen's name and likeness without his consent.

129.     Chen competes with Cayman Arts for a common pool of customers

18

130.    Such unfair competition has caused and continues to cause irreparable harm and damage to Chen.

**WHEREFORE**, the Plaintiff, Chen, respectfully requests that this Court enter a temporary and permanent injunction prohibiting further use of his name and likeness by Cayman Arts and Steele, judgment for damages against Cayman Arts, and costs, interest and such other and further relief as the Court deems just and proper, and a trial by jury on all issues so triable.

<u>COUNT VI -</u>
<u>RECOVERY OF OVERTIME COMPENSATION</u>

131.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

132.    Chen was an employee of Defendant, Cayman Arts, and brings this action on behalf of himself for overtime compensation and other relief under the Fair Labor Standards Act, as amended, 29 U.S.C. §216(b).  Plaintiff performed his job duties and related activities for Defendant in Palm Beach County, Florida.

133.    At all times material hereto, Steele owned three (3) homes in Palm Beach County, Florida and owned and operated Cayman Arts (also in Palm Beach County Florida) and regularly exercised the authority to hire and fire employees, determined the work schedules of employees, set the pay rate of employees, and controlled the operations and finances of Cayman Arts. By virtue of such control and authority, Steele was an employer of Chen as defined by the FLSA and is individually liable to Chen for unpaid overtime.  29 U.S.C. §201 <u>et seq</u>.

134.    Jurisdiction is conferred on this Court by Title 28 U.S.C. §1337 and by Title 29 U.S.C. §216(b).  At all times pertinent to this Complaint, Defendant, Cayman Arts, has been an enterprise engaged in interstate commerce or in the production of goods for commerce as defined in §3(r) and 3(s) of the Act, 29 U.S.C. §203(r) and 203(s).  Based on information and belief, the

19

annual gross sales volume of Defendant, Cayman Arts, has been in excess of $500,000 per annum at all times material to this Complaint. Chen was individually engaged in interstate commerce as a result of his position with Defendants.

135.    Sometime on or about September 2004, Steele hired Chen as a full-time, exempt employee of Cayman Arts. Chen's hours were to be far more than 50 a week. Paragraph 8, entitled "Hours", to the Addendum to Agreement (Exhibit "C") provides:

> Employee acknowledges and understands that the demand and scope of the project that Employee is engaging in.   The Corporation's expectation of Employee exceeds fifty plus (50+) working hours per week with weekends as needed. …Employee agrees that Employee will provide coverage via cell phone for troubleshooting purposes during business operating hours when Employee is otherwise off-site or not on Corporation time.

136.    Chen worked extraordinarily long hours and did all that was required of him to complete his assignments.

137.    As part of his employment with Cayman Arts, Chen was paid an annual salary of $81,000.

138.    On or about June 10, 2005, Steele (**not** Cayman Arts) made a personal loan to Chen in the amount of 17,000.00. See attached Exhibit F.

139.    From approximately June 2005 through September 2009, **Cayman Arts,** a non-party to the loan transaction, deducted approximately $172.35 from Chen's bi-weekly paycheck in repayment of the loan made personally by Steele to Chen.

140.    Cayman Arts made wholly improper deductions for Chen's loan payment on his personal loan from Steele (ignoring all semblance of corporate formalities suggesting Cayman Arts is a mere instrumentality or alter ego for Steele) for approximately 109 pay periods.

141.    Cayman Arts made improper deductions for Chen's loan payment on his personal

loan to Steele totaling approximately $18,786.15.

142.   Chen also made a lump sum payment in the amount of $2,500 which means he in fact, paid Steele approximately $21,286.15 for repayment of the $17,000 (approximately $18,786.15 in payroll deductions plus $2,500 lump sum payment equals $21,286.15).

143.   However, even after the $17,000 personal loan made by Steele to Chen was repaid, Cayman Arts, incredibly, continued to take payroll deductions from Chen's wages.

144.   Therefore, Cayman Arts also improperly deducted approximately $4,286.00 more than the total personal loan amount ($17,000.00) that Chen owed to Steele.

145.   Cayman Arts improperly deducted more than the original loan amount that Chen owed to Steele for approximately twenty-four (24) pay periods.

146.   The deductions made from Chen's salary for the personal loan made to him by Steele, (or alternatively for the over-deductions made for approximately twenty-four (24) pay periods) were not for any one of the exceptions under the Fair Labor Standards Act, as amended, 29 U.S.C. §216(b).

147.   Chen did not receive the full and predetermined salary amount in any week in which he performed work for Cayman Arts.

148.   Consequently, Chen was not an exempt employee under the Fair Labor Standards Act, as amended, 29 U.S.C. §216(b).

149.   Chen regularly worked in excess of forty (40) hours in one or more work weeks during his employment with Defendants (in fact, his contract required he do so, See Exhibit C, paragraph 8), with respect to the duties for Cayman Arts.

150.   However, in the course of Chen's employment with Defendants, he was not paid time and one-half of his regular rate of pay for any of his hours worked in excess of forty (40)

hours per week during one or more weeks.

151.    The records, if any, concerning the compensation paid to Chen are in the possession and custody of Defendants. It is believed that Defendants failed to meet their statutory obligations to maintain time records of all time worked by Chen and also post the notice required to be posted informing Chen of his rights under the FLSA.

152.    At all times material, Steele acted in the "interest of the employer" and, therefore, has individual liability as the person who made the decisions concerning Chen's employment and compensation.

153.    Defendants acted intentionally so as to allow the statute of limitations to be extended to three years.

154.    Chen has retained the undersigned counsel to represent him in this action and pursuant to 29 U.S.C. §215(b), Chen is entitled to recover all reasonable attorneys' fees and costs incurred in this action.

**WHEREFORE,** Plaintiff Chen respectfully requests judgment against Defendants Cayman Arts and Steele, jointly and severally, for the payment of all overtime hours at one and one-half his regular rate of pay due to him for the hours worked for which he has not been properly compensated, liquidated damages, and prejudgment and post judgment interest, reasonable attorneys' fees pursuant to 29 U.S.C. §215(b) and costs, and such further relief that this Court deems just and appropriate.

### COUNT VII –
### TORTIOUS INTERFERENCE WITH ADVANTAGEOUS
### BUSINESS RELATIONSHIPS (OCEAN REEF)

155.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

22

156.   At all times material hereto, Chen had an advantageous business relationship with Ocean Reef. This relationship includes but is not limited to services and artwork created by Chen for a fishing tournament held by the Club in December, 2009.

157.   At all times material hereto, Steele and Cayman Arts were aware of the existence of this relationship.

158.   Despite knowledge of this relationship, Steele and Cayman Arts unjustifiably and tortiously interfered with this relationship.

159.   Steele and Cayman Arts did so by engaging in various misconduct including, but not limited to, contacting Ocean Reef and stating that they "own" Chen and that any payment for services and artwork created by Chen for Ocean Reef should be paid directly to Cayman Arts.

160.   Steele and Cayman Arts went so far as to send Ocean Reef an invoice from Cayman Arts for the work performed by Chen, for which Steele and Cayman Arts had no legal or contractual right to do.

161.   Steele's and Cayman Arts' conduct was intended to benefit himself and Cayman Arts to the detriment of the Chen and his relationship with Ocean Reef. Steele's and Cayman Arts' conduct was willful, intentional and malicious sufficient to justify the imposition of punitive damages then both.

162.   As a legal and proximate result of the tortious interference, Chen has suffered damages including, but not limited to, lost profits, loss of use of money to which he was entitled to be paid, incurring professional expenses, lost reputation, and lost business good will.

**WHEREFORE**, the Plaintiff, Chen, respectfully requests that this Court enter judgment for compensatory and punitive damages against the Defendants, jointly and severally, in addition

to costs, interest and such other and further relief as the Court deems just and proper, and a trial by jury on all issues so triable.

## COUNT VIII –
## TORTIOUS INTERFERENCE WITH ADVANTAGEOUS
## BUSINESS RELATIONSHIPS (BOAT SHOW)

163.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

164.    At all times material hereto, Chen had an advantageous business relationship with the Miami International Boat Show ("Boat Show"), being held February 11-15, 2010.

165.    This relationship includes but is not limited to Chen setting up a booth and exhibiting artwork and merchandise created by Chen, post-employment with Cayman Arts, to the general public and boating community.

166.    The Boat Show is a major event in the boating industry and any interference with Chen's ability to show his works to the general public and other members of the boating community will be disastrous to Chen's reputation and business good will.

167.    At all times material hereto, Steele and Cayman Arts were aware of the existence of this relationship.

168.    Despite their knowledge of this relationship, Steele and Cayman Arts have unjustifiably and tortiously interfered with this relationship.

169.    Steele and Cayman Arts did so by engaging in various misconduct including, but not limited to, informing representatives of the Boat Show that they "own" Chen, that Chen should not be allowed to set up his own booth and exhibit any of his artwork, and that any artwork and/or merchandise shown by Chen is the property of Cayman Arts.

24

170.    In fact, in the list of exhibitors on the Boat Show website, the entry for Cayman Arts appears as "Carey Chen/Cayman Arts, Inc.", despite the fact Chen terminated his employment with Cayman Arts over four months ago.

171.    Steele and Cayman Arts are intentionally, and without justification, attempting to mislead and confuse the public into believing that Chen is associated with Cayman Arts.

172.    Steele's and Cayman Arts's conduct was intended to benefit themselves to the detriment of the Chen and his relationship with the Boat Show. Steele's and Cayman Arts' conduct was willful, intentional and malicious sufficient to justify the imposition of punitive damages then both.

173.    As a legal and proximate result of the tortious interference, Chen has suffered damages including, but not limited to, lost profits, loss of use of money to which he was entitled to be paid, incurring professional expenses, lost reputation, and lost business good will.

**WHEREFORE**, the Plaintiff, Chen, respectfully requests that this Court enter judgment for compensatory and punitive damages against the Defendants, jointly and severally, in addition to costs, interest and such other and further relief as the Court deems just and proper, and a trial by jury on all issues so triable.

## COUNT IX – BREACH OF IMPLIED COVENANT OF GOOD AND FAIR DEALING

174.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

175.    On or about May 20, 2005, Cayman Arts and Chen entered into the Employment Agreement, Addendum to Agreement ("Addendum"), and Trademark and Product License Agreement ("Licensing Agreement") (hereinafter collectively referred to as the "Agreements"), each with an effective date of September 1, 2004.

176.    Based upon its various contractual obligations to Chen, Cayman Arts, owed a duty to deal both fairly and in good faith with, and for the benefit of, Chen.

177.    The Defendant, Cayman Arts, breached this implied covenant of good faith and fair dealing by breaching the Agreements, sabotaging numerous potentially lucrative and high profile projects offered to Chen by outside parties, failing to use its "best efforts" to promote, distribute, sell and offer for sale Chen's artwork and services, as it was required to do pursuant to the Agreements, by using its funds for the private use of its principal, Steele, having the effect of altering Cayman Arts' financial figures and preventing Chen from ever achieving a Bonus under the Agreements, and by unreasonably preventing Chen from taking on potentially lucrative projects, refusing to disclose Cayman Arts' financial information to Chen.

178.    The Defendant, Cayman Arts, has breached the implied covenant of good faith and fair dealing that it owed to Chen.

179.    As a legal and proximate cause of Cayman Arts' actions, the Plaintiff has suffered damages and is entitled to all the actual and consequential damages caused by the breach of that covenant.

**WHEREFORE,** Plaintiff, Chen, respectfully requests that this Court enter judgment for damages against Defendant, Cayman Arts, with costs, interest and such other and further relief as the Court deems just and proper, and trial by jury on all issues so triable.

## COUNT X-
## ACCOUNTING

180.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

181.    This is an action for an accounting by Chen against Cayman Arts.  Cayman Arts has breached the Agreement between them.   Specifically, the Employment Agreement, Addendum, and Licensing Agreement.  (See Exhibits B-D.)

182.    Specifically, Paragraph 2 of the Addendum to the Employment Agreement, entitled Other Potential Compensation, provides, in pertinent part:

> 2(a)    Bonus from Net Annual Profit.  Employee shall be entitled to receive twenty (20) percent in Bonus from Net Annual Profit ("Bonus from Profit") only on annual Net Profits that exceed $100,000 (if realized) from the Net Sales of the Corporation's Licensed Products or Product Marks sold directly by the Corporation or sold through an authorized licensee.

183.    Cayman has kept the books and records and has denied Chen access to any financial information whatsoever which would show the manner in which Cayman calculated Net Profits.  Chen does not know the current financial status of Cayman and has not seen accurate and usable financial statements such that he can determine whether he is owed additional remuneration as a result of Paragraph 2 of the Addendum to his Employment Agreement. Nor can Chen demonstrate whether or not Steele may have used Cayman Arts improperly to divert its revenue/profits to Steele personally (instead of to Chen as required by the Agreements), which Chen believes the books and records may reflect.

184.    Upon information and belief, Cayman has collected and/or disbursed large sums of money, the amount of which is unknown to Chen and Cayman has failed to ever disclose appropriate financial information to Chen to determine whether Chen was entitled to this other potential compensation.  Cayman requests an accounting from the inception of the Employment Agreement to present and requests information regarding Net Profits and seeks to recoup amounts revealed by the accounting to be owed to him.

185.   Cayman is required to provide an accounting to Chen.  Chen requires that Cayman Arts provide a formal accounting of its financial affairs as Chen is without an adequate remedy at law.

**WHEREFORE,** Plaintiff, Chen, respectfully requests that this Court enter judgment ordering an accounting of the financial affairs of Defendant, Cayman Arts, and requiring a recoupment of any Net Profits as determined to be owed by Chen ad a result of such accounting and for interest, costs, and such other and further relief as the Court deems just and proper.

## COUNT XI -
## UNJUST ENRICHMENT

186.   The allegations contained in paragraphs 1 through 6 are hereby incorporated and realleged herein.

187.   During the course of his employment, Chen was provided a personal loan by Steele in the amount of $17,000.00.

188.   To pay back the loan, Cayman Arts deducted payments each month out of Chen's paycheck.

189.   At some point, the Chen's loan was paid in full, however, Cayman Arts continued to deduct money from Chen's paycheck.

190.   A total amount of $21,296.00 was collected by Cayman Arts over the course of Chen's employment.

191.   Cayman Arts owes Chen an amount of at least $4,286.00 in over-deducted funds.

192.   The circumstances are such that it would be inequitable for Cayman Arts to retain the benefit of Chen's money without returning it in full and without paying for said services.

193.    Because Chen of the over-deductions, Chen was not paid wages for work performed and, therefore, he is entitled to an award of attorneys' fees pursuant to Fla.Stat. Section 448.08.

**WHEREFORE**, the Plaintiff, Chen, respectfully requests that this Court enter judgment for damages against the Defendant, Cayman Arts, in addition to costs, interest, attorneys fees and such other and further relief as the Court deems just and proper, and a trial by jury on all issues so triable.

## COUNT XII - DECLARATORY RELIEF

194.    The allegations contained in paragraphs 1 through 76 are hereby incorporated and realleged herein.

195.    A bona fide dispute has arisen between Chen and Cayman Arts regarding the purported Employment Agreement and whether Chen is still an employee of Cayman Arts.

196.    A bona dispute has arisen between Chen and Cayman Arts regarding the purported Licensing Agreement and whether the Licensing Agreement is, in fact, a valid and enforceable contract.

197.    Chen is entitled to an adjudication of the existence or non-existence of the rights and/or powers of the parties pursuant to the alleged Employment Agreement and Licensing Agreement.

198.    The relationship between the parties was previously contractual in nature.

199.    Chen believes that he made a valid resignation from his employment to Cayman Arts pursuant to the terms and conditions of the Employment Agreement.

200.    Chen believes that, by virtue of the twenty (20) year assignment clause contained within the Licensing Agreement (one that continues even after the termination of Chen's employment with Cayman Arts), the Licensing Agreement is an invalid restriction on free trade and unenforceable.

201.    Chen believes that by virtue of its indefinite terms (i.e. whether it addresses trademarks or copyrights), the Licensing Agreement is invalid and unenforceable.

202.    Based upon Cayman Arts' and Steele's actions, there is a clear, bona fide and adverse interest between the parties concerning the rights and obligations of Chen pursuant to the Employment Agreement and Licensing Agreement.

203.    Chen is in doubt about the existence or non-existence of his rights, privileges, duties, responsibilities and/or liabilities under the Employment Agreement and Licensing Agreement.

204.    Chen is entitled to a declaration of his rights, privileges, duties, responsibilities and/or liabilities pursuant to the Employment Agreement and Licensing Agreement.

205.    The Plaintiff and Defendants in this matter have equal, present and adverse interests in the interpretation and/or enforceability of the subject agreements.

206.    Therefore, pursuant to Florida Statute §86.011, Chen seeks a declaration from the court:

    (a) declaring Chen resigned from his employment with Cayman Arts pursuant to the terms and conditions of the Employment Agreement and that his employment ended on October 8, 2009;

    (b) declaring that the Licensing Agreement, including but not limited to the 20 year restriction contained therein, is invalid and unenforceable as an

30

invalid restraint on trade;

(c) declaring that Cayman Arts and Steele have no ownership rights, licensing rights, or any other rights, with respect to Chen's artwork, merchandise, or other works and creations, subsequent to his resignation from Cayman Arts;

(d) declaring that Cayman Arts and Steele have no ownership, licensing rights, or any other rights, with respect to Chen's artwork, merchandise, or other works, prior to his employment with Cayman Arts; and

(e) declaring the Licensing Agreement is invalid and unenforceable for indefiniteness of terms.

**WHEREFORE,** Plaintiff, Chen, herein demands a declaratory judgment against all Defendants, declaring the parties rights and obligations under the Employment Agreement and Licensing Agreement, the validity and enforceability of the Licensing Agreement, and seeks ancillary relief and damages and recovery of prevailing party fees and costs and preserving the right under Florida Statute §86.061 to move for appropriate supplemental relief.

**TRIAL BY JURY IS REQUESTED ON ALL COUNTS SO TRIABLE.**

SCHWARZBERG & ASSOCIATES
222 Lakeview Avenue
Esperanté – Suite 210
West Palm Beach, Florida 33401
Telephone:      (561) 659-3300
Facsimile:      (561) 659-1911
BY: _____
STEVEN L. SCHWARZBERG
Fla. Bar No. 306124
steve@schwarzberglaw.com
JANET BERNSTEIN TEEBAGY
Fla. Bar No. 063339
jteebagy@schwarzberglaw.com
JEFFREY C. PEPIN
Fla. Bar No. 416304
jpepin@schwarzberglaw.com
CARRIE B. CHERVENY
Fla. Bar No. 22408
ccherveny@schwarzberglaw.com

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on February 12, 2010, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Steven L. Schwarzberg
Steven L. Schwarzberg

FILE No.308 08/09 '04 09:21   ID:CSC TALLAHASSEE        FAX:850 558 1515        PAGE   2

# P04000115900

## Florida Department of State
### Division of Corporations
### Public Access System

### Electronic Filing Cover Sheet

**Note: Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.**

(((H04000163012 3)))

**Note:** DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.

```
To:
     Division of Corporations
     Fax Number    : (850)205-0381

From:
     Account Name   : CORPORATION SERVICE COMPANY
     Account Number : I20000000195
     Phone          : (850)521-1000
     Fax Number     : (850)558-1575
```

FILED
2004 AUG -9 A 8:30
SECRETARY OF STATE
TALLAHASSEE, FLORIDA

## FLORIDA PROFIT CORPORATION OR P.A.

### CAYMAN ARTS ACQUISITION, INC.

| | |
|---|---|
| Certificate of Status | 0 |
| Certified Copy | 0 |
| Page Count | 02 |
| Estimated Charge | $70.00 |

Electronic Filing Menu        Corporate Filing        Public Access Help

EXHIBIT

A

FILE No.308 08/09 '04 09:21   ID:CSC TALLAHASSEE   FAX:850 558 1515   PAGE 2/ 2

H04000163012 3

# ARTICLES OF INCORPORATION
In compliance with Chapter 607 and/or Chapter 621, F.S. (Profit)

## ARTICLE I   NAME
The name of the corporation shall be:

    Cayman Arts Acquisition, Inc.

## ARTICLE II   PRINCIPAL OFFICE
The principal place of business/mailing address is:
    1507-A South University Drive
    Planation, FL 33324

## ARTICLE III   PURPOSE
The purpose for which the corporation is organized is:
    Promoting and selling angler artwork and products (i.e., shirts, hats, bags, etc.)
    and any other lawful business permitted by a Florida corporation

## ARTICLE IV   SHARES
The number of shares of stock is:
    1,000 shares of common stock

## ARTICLE V   INITIAL OFFICERS AND/OR DIRECTORS
List name(s), address(es) and specific title(s):

    Scott Steele, President, Secretary and Treasurer
    Scott Steele, Director
    5700 Executive Drive, Baltimore, Maryland 21228

## ARTICLE VI   REGISTERED AGENT
The name and Florida street address (P.O. Box NOT acceptable) of the registered agent is:

    Corporation Service Company
    1201 HAYS Street
    Tallahassee, FL  32301

## ARTICLE VII   INCORPORATOR
The name and address of the Incorporator is:
    Yaakov E. Spatz, Esquire
    100 Light Street, Suite 1100
    Baltimore, Maryland 21202

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Having been named as registered agent to accept service of process for the above stated corporation at the place designated in this certificate, I am familiar with and accept the appointment as registered agent and agree to act in this capacity*

Corporation Service Company

By: _____        8/5/04
    Signature/Registered Agent        Date

    _____        8/5/04
    Signature/Incorporator        Date

H04000163012 ₹

## EMPLOYMENT AGREEMENT

THIS AGREEMENT (and Addendum attached hereto) is executed on this ___ day of _____, 2005, but is made to be effective as of the 1st day of September, 2004 (the "Effective Date") by and between CAYMAN ARTS, INC., a Florida Corporation, its affiliates and/or subsidiaries (the "Corporation"), and Carey Chen (the "Employee"). When referencing each of the above individually they shall be referred to hereafter as "Party", and when referencing both of the above together they shall be referred to hereafter as "Parties."

### W I T N E S S E T H

FOR GOOD AND VALUABLE CONSIDERATION AND CONTINUED EMPLOYMENT, it is mutually agreed as follows:

     1.    Employment. The Corporation hereby employs the Employee and the Employee hereby accepts employment with the Corporation upon the terms and conditions hereinafter set forth.

     2.    Term. Subject to the provisions for termination and extension as hereinafter provided, the term of this Agreement shall be for one year from September 1, 2004 extending through to August 31, 2005 (the "Term"). This Agreement shall automatically be extended for one or more additional Terms of one (1) year thereafter on the same terms and conditions unless one Party notifies the other, at least thirty (30) days prior to the date on which the Agreement otherwise would have been automatically renewed of an intent to terminate the Agreement at the end of the given contractual Term. The term of an additional year shall continue in force from year to year thereafter, unless one Party notifies the other, at least thirty (30) days prior to the expiration of the additional year, of an intent to terminate the Agreement at the end of the period. (See Addendum for additional terms)

     3.    Trademark and Product License Agreement: This Agreement shall be subject to all rights title and interest as described in the Trademark and Product License Agreement attached hereto as Exhibit "B" and regardless of the continuation, termination or expiration of Employee's employment status, the Trademark and Product License Agreement shall remain in full force and effect throughout the prescribed twenty (20) year effective period. This Section 3. shall survive termination independent of this Agreement and as described in Sections 10 and 17 herewith.

     4.    Compensation. In consideration for services rendered by the Employee to the Corporation pursuant to this Agreement, the Corporation shall pay to the Employee all that compensation as described in the attached Addendum.

     5.    Duties. The Employee is engaged by the Corporation as Lead Artist to develop design and produce original art work and is an accomplished artist specializing in marine and aquatic life artistic renderings for the Corporation and his primary duty shall be the performance of work requiring invention, imagination, originality or talent of artistic

| Deleted: 5/18/2005 |
| --- |

7/26/2009          1

**EXHIBIT**

*tabbies*

B

or creative endeavor on behalf of the Corporation. The Employee's duties are further described in the Addendum and Exhibit "A" attached hereto.

6.      Corporation owns all those designs, marks, trademarks, brands, trade names, artwork, graphics, service marks, symbols, depictions, original art work and other proprietary works of any kind, associated with the creation of artistic renderings, paintings and/or images by Employee as described in the attached Trademark and Product License Agreement (Exhibit "B"), including but not limited to, the Carey Chen Collection and all products, renderings and images that are created, manufactured or rendered by Employee, regardless of the medium in which they are created, now or in the future, and the goodwill associated therewith, and, which collectively are the intellectual property and property of Corporation (hereinafter collectively referred to as "Licensed Products"); and

7.      Employee desires to be employed by Corporation to render his services to Corporation in the planning, creation, preparation, labor and rendering of artwork for use on Corporation's Licensed Products, and intends for Corporation to own all rights in and to the Licensed Products through the attached Trademark and Product License Agreement (Exhibit "B"), including all copyrights, created prior to or during the duration of the Trademark and Product License Agreement.

8.      Employee warrants that the Licensed Products, Product Marks and Works created, prepared or rendered for Corporation, either as existing Works, Works in progress or new Works, is original to him and has not been copied and will not be copied or derived from any material owned by another who has not authorized his use of that material for the benefit of the Corporation.

9. Termination for cause. Upon at least thirty (30) days prior written notice to the Employee, Corporation may terminate this Agreement, during its term, only for "cause" which, for purposes herein, shall mean Employee's (i) material and continuing failure to perform his or her duties hereunder; including but not limited to failure to work full-time on the business of Corporation for reasons other than disability; or (ii) dishonesty; or (iii) gross misconduct or gross dereliction of duty; or (iv) fraud, misrepresentation or other acts of moral turpitude or criminal conduct; or (v) a material breach of any term of this Agreement or the attached Addendum. In the event Employee commits a material breach of the obligations and duties of Employee under this Agreement or the attached Addendum, or commits any acts designated as conduct in violation of the Corporation's Employment Policies, Employee's employment shall be subject to immediate dismissal or termination.

If the Corporation so requests, the Employee shall continue to render his/her services to the Corporation and shall earn his/her regular compensation up until the date of termination. However, the Corporation shall have the right to give the Employee severance pay in lieu of requiring the Employee to continue to work for the Corporation until the date of termination. Said severance pay shall be equal to the Compensation which Employee would have been entitled to receive as described in the Addendum attached hereto.

| Deleted: 5/18/2005 |

7/26/2009                                    2

10. Termination by Employee. In the event that the Employee terminates his/her employment with the Corporation by giving at least thirty (30) days prior written notice, the Corporation shall be obligated to pay the Employee's Compensation (as described in the Addendum attached hereto) only until the date that the Employee leaves the employ of the Corporation; provided, however, if the Corporation requests that the Employee leave the employ of the Corporation prior to the expiration of such thirty (30) day period, the Corporation shall pay the Employee's Compensation for such full thirty (30) day period. However, regardless of termination, Employee shall remain bound by the provisions describing the Trademark and License Agreement described in Section 3. herein.

11. This Agreement (a) inures to the benefit of the successors and/or assigns of Corporation, and (b) is binding upon Employee's heirs and legal representatives.

12. Extent of Services. While engaged by Corporation, Employee shall devote his described time, full attention and energies to the business of the Corporation.

During the Term(s) of this Agreement, Employee shall not be engaged in any other business activity with respect to the management or oversight for another Corporation, artistic entity, or other similar business as that of the Corporation (regardless of whether or not it is pursued for gain, profit or other pecuniary advantage). However, this section shall not be construed to prevent Employee from investing his/her monetary assets in other Companies or entities and so long as such investment does not require that Employee render services in the operation of the affairs of the said Companies or entities that conflict with his/her duties with the Corporation.

13. Expenses. The Employee may be authorized to incur reasonable expenses for performing and promoting the business of the Corporation. Because of these obligations on the part of the Employee and solely to reimburse the Employee for his/her necessary expenses in connection with these obligations, the Corporation will reimburse the Employee for all business travel expenses which may have been expressly required by Employer, including, but not limited to an automobile expense of Corporation's current rate not to exceed the Internal Revenue Service's allowable rate per mile driven over 25 miles round trip from the Employee's office, and all parking and pre-approved entertainment expenses, but shall be so limited to those items and values as described in and within the parameters provided for in the Corporation's Employee Travel and Entertainment Handbook. Employee shall present to the Corporation an itemized report showing his/her expenditures for each category of business expense set forth in this paragraph and type of duties to which the expenses relate. Expense reports should be submitted on the Corporation's approved Expense Report Sheet attaching copies of all charges and each month's Expense Report (provided expenses have been incurred) shall be submitted within the first ten days of the month following the month the expenses were outlaid. Provided the expenses are submitted timely and approved, Employee shall be reimbursed by the end of the month following the expense. Additionally, Employee will be granted a monthly allowance of $30.00 for a cell phone plan and usage provided

| Deleted: 5/18/2005 |

Employee makes themselves available for corporate phone calls during hours of operation when Employee is not on-site or present.

14.     Employment Policy.  The Employee shall comply with all policies, standards and regulations of the Corporation now or hereafter promulgated and this Agreement shall incorporate all provisions, conditions and obligations specified in the Corporation's Employee Handbook.

15.     Professional Exemption.  Employee hereby affirmatively assents, agrees and acknowledges that he/she is employed by Corporation in a professional, learned and/or creative, exempt employment capacity, and:

> a. Employee's duties and responsibilities involve the performance of work requiring invention, imagination, originality or talent in a recognized field of artistic or creative endeavor; and

> b. Employee customarily and regularly exercises discretion and independent judgment; and

> c. Employee is primarily engaged in the duties of the Corporation that subject him/her to an exemption.

16.     Disclosure of Information.  Employee recognizes and acknowledges that as a professional employee of the Corporation, and in his/her employment hereunder, he/she will make use of, acquire, develop, add to, and otherwise have access to confidential information that is a valuable, special and unique asset of the Corporation's business ("Confidential Information").  Such Confidential Information concerns but is not limited to such matters as art work, trade secrets, systems, processes, business operations, pricing, procedures, markets, technical information, lists of current customers, clients, suppliers or potential customers, clients or suppliers, and the internal structure of the Corporation, as well as the amount, nature and type of services provided by the Corporation to its customers, the equipment, materials and methods used by the Corporation on behalf of its customers, and any method and/or procedure relating or pertaining to the projects developed by the Corporation and or contemplated by the Corporation to be developed.  Additionally, Confidential Information shall also include any of the Corporation's data or information that is competitively sensitive material, and not generally known to the public, including without limitation to existing or proposed products, financial information, including but not limited to historical financial statements, financial projections and budgets, historical and projected sales, capital spending and budgets, planning information, marketing strategies, plans, finance operations, customer, client and supplier relationships, customer, client and supplier profiles, sales estimates, business plans, and internal performance results relating to the past present or future business activities of the Corporation, its subsidiaries and/or affiliated companies, and the customers, clients and suppliers of any of the foregoing; any of the Corporation's technical information, designs, formulas, or improvements that are commercially valuable and secret in the sense that their confidentiality affords the

| Deleted: 5/18/2005 |

7/26/2009                                          4

Corporation a competitive advantage over its competitors; all of the Corporation's confidential or proprietary concepts, documentation, reports, data (including magnetic tapes), specifications, flow charts, databases, inventions, interfaces, information, and trade secrets, whether or not patentable or copyrightable; all notes, analysis, compilations, statistics, summaries, interpretations and other material which contains, is based on or otherwise reflects in whole or in part, any of the foregoing.

Confidential Information includes without limitation and regardless of the form or manner of disclosure, all proposals, contracts, documents, inventions, engineering and laboratory notebooks, drawings, diagrams, specifications, equipment, prototypes and models, and any other tangible manifestation of the foregoing which now exist or come into the control or possession of the Corporation. Therefore, the Employee agrees that he/she will not, for any purpose whatsoever, divulge or disclose any of such Confidential Information in perpetuity, but will keep the same inviolate, except to those persons with whom the Employee is assigned to work by and/or within the Corporation and who need to know such information in carrying out their jobs. Further, upon leaving the employ of the Corporation for any reason whatsoever, the Employee shall not take with him, nor provide to any other person, firm, Corporation, association or other entity without prior written consent of the Board of Directors of the Corporation, any Confidential Information, drawing, diagram, picture, photograph, and/or other reproduction, prototype or sample tapes, card decks, listings, programming documentation, and/or any other written, graphic recorded or physical information or samples relating or pertaining to the Corporation and its products. Should the Employee breach or threaten to breach the provisions of this section, either during the period of employment or at any time after the Employee ceases to be employed by the Corporation, the Corporation shall be entitled to obtain an immediate injunction restraining the Employee from disclosing for any reason whatsoever, in whole or in part, said information, or from rendering any services to any person, firm, Corporation, association or entity to whom such information has been disclosed or is threatened to be disclosed. Nothing herein shall be construed as prohibiting the Corporation from pursuing any other remedies available to it for such breach or threatened breach, including the recovery of damages and attorney's fees from the Employee.

    17.    Restrictive Covenants.

    A. That, for a period of three (3) years after he/she ceases to be employed by the Corporation, the Employee will not, directly or indirectly solicit, urge, or call on any current customer or client or potential customer or client of the Corporation or its affiliates or subsidiaries to discontinue doing business with the Corporation, in whole or part, or not to do business with the Corporation.

    B. That for a period of three (3) years after he/she ceases to be employed by the Corporation, the Employee will not solicit for the purpose of hiring, influencing or attempting to influence any employee of the Corporation or its affiliates or subsidiaries to terminate his or her employment with the Corporation.

Deleted: 5/18/2005

C. In the event of a breach of any of the restrictions set forth in this section, the Corporation shall be entitled to seek an injunction to enforce said restrictions to be determined and enforced by a court of competent jurisdiction.

18.     Disavowal or Condonation of Performance as Waiver.  The failure of the Corporation at any time to require performance by the Employee of any provision expressed herein shall in no way affect the right of the Corporation thereafter to enforce such a provision;  nor shall the waiver by the Corporation of any provision expressed herein be taken or held to be a waiver of a provision itself.

19.     Termination by Employee.  In the event that the Employee terminates his/her employment with the Corporation by giving at least thirty (30) days prior written notice, the Corporation shall be obligated to pay the Employee's Compensation (as described in the Addendum attached hereto) only until the date that the Employee leaves the employ of the Corporation; provided, however, if the Corporation requests that the Employee leave the employ of the Corporation prior to the expiration of such thirty (30) day period, the Corporation shall pay the Employee's Compensation for such full thirty (30) day period.

20.     Death/Disability During Employment.  It is understood and agreed that all payments, whether salary or otherwise, payable to the Employee in accordance with any of the provisions of this Agreement shall be paid to him during this lifetime and not otherwise. Upon the death of the Employee, this Agreement shall terminate and the Corporation, its successors and assigns, shall be released and discharged of any and all obligations whatsoever to make further payment to the Employee's estate, except as to salary, commissions or other compensation earned for actual services rendered before the time of the Employee's death.

21.     Writing.  Any notice or communication required or permitted to be given under this Agreement shall be sufficient if in writing and shall be deemed to be given when sent by registered or certified mail, postage prepaid, return receipt requested, and if intended for the Employee, shall be addressed to him at his/her residence, and if intended for the Corporation, shall be addressed to it at 5700 Executive Drive, Baltimore, Maryland 21228. Either Party may give notice to the other, in the manner provided, of such other address for notification purposes.  No waiver of modification of any provision of this Agreement shall be made valid unless it is in writing, dated and signed by the Party against whom enforcement of any waiver, change, modification, extension or discharge is sought.

22.     Waiver of Breach.  The waiver by the Corporation of a breach of any provision of this Agreement by the Employee shall not operate or be construed as a waiver of any subsequent provision or breach by the Employee.

23.     Agreement Inclusive.  This Agreement supersedes any and all other employment agreements, whether written or oral, by and between the Employee and the Corporation or its predecessors.

Deleted: 5/18/2005

7/26/2009                                              6

24.     Entire Agreement.  This instrument contains the entire agreement of the Parties.

25.     Governing Law.  The provisions of this Agreement shall be governed by the laws of the State of Florida.

26.     Severability.  The parties agree that should any part, term or provision of this Agreement or the Attached Addendum contravene or be invalid under the laws of the State of Florida, then such contravention or invalidity shall not invalidate the whole Agreement; rather the Agreement shall be construed as if it did not contain the invalid provision, and the rights and obligations of the parties shall be enforced accordingly.

27.     Amendments.  Employee agrees and acknowledges that for good and valuable consideration, he/she shall abide by any modifications, amendments or changes to the Agreement and the Addendum attached hereto as deemed necessary by the Corporation from time to time and shall agree to incorporate herein any reasonable revision, modification or amendment(s) thereto.

IN WITNESS WHEREOF, the Corporation has caused this Agreement to be signed by its duly authorized officer, and the Employee has hereunto set his hand as of the day and year first above written.

CAYMAN ARTS, INC.

By:_____          _____
   _____          WITNESS

Employee:

_____            _____
Carey Chen                          WITNESS

Deleted: 5/18/2005

05-09-2005  11:35      9541244258      CAYMAN ARTS, INC              PAGE  08/17

## ADDENDUM to AGREEMENT

This Addendum to Agreement (the "Addendum") shall be made a part of and incorporated into the Employment Agreement (the "Agreement") executed contemporaneously herewith and attached hereto by and between CAYMAN ARTS, INC., a Florida Corporation, its successors, assigns, affiliates and/or subsidiaries (the "Corporation"), and Carey Chen (the "Employee". For good and valuable consideration it is agreed as follows:

Employee shall receive the following compensation for services to be rendered as Lead Artist for the Corporation. The Employee shall be categorized as a professional, learned and/or creative, full-time, exempt employee.

### 1. COMPENSATION:

For the first year of employment, Employee shall receive Compensation in the form of an annual base salary of $81,000.00 ("Base Salary"). Employee shall be entitled to further compensation as set forth in Section Two and described below as "Other Potential Compensation" as it is earned by the Corporation. Employee's annual Base Salary shall be paid in 26 equal, bi-weekly installments during the Term of the Agreement under the Corporation's normal pay periods. All Bonuses from Profit shall be distributed according to the criteria described in Section 2. below and so long as Employee continues to maintain favorable reviews on the Corporation's Employment Performance Evaluations.

### 2. OTHER POTENTIAL COMPENSATION:

2.(a.)  Bonus from Net Annual Profit. Employee shall be entitled to receive twenty (20) percent in Bonus from Net Annual Profit ("Bonus from Profit") only on annual Net Profits that exceed $100,000.00 (if realized) from the Net Sales of the Corporation's Licensed Products or Product Marks sold directly by the Corporation or sold through an authorized licensee. "Net Sales" shall mean Corporation's gross sales price of Licensed Products or Product Marks sold directly or through an authorized licensee to Corporation's customers, less any sales tax, freight costs, promotional expenses, distribution and operational expenses or other transportation charges. The Net Sales amount used pursuant to this section in the computation of Bonus from Profit shall be the genuine and objective selling price which would be established in a customary, bona-fide arms-length transaction between unrelated and independent parties. As used in this Agreement, any and all dollar amounts shall be deemed to be U.S. Dollars;

In order for Employee to be entitled to Bonus from Profit, the Corporation must realize an annualized net profit at the end of each fiscal year beginning on January 1, and ending on December 31, of each and every year in excess of $100,000.00.

Bonuses from Profit (if applicable) shall be distributed to Employee within 45 days from the end of each previous year on an annualized basis.

2.(b.)  Should the Corporation be sold during the course of Employee's

5/18/2005                                    1

EXHIBIT

tabbies®

$C$

employment, Employee shall be entitled to twenty (20) percent of the Net Sales amount of the Corporation that exceeds $500,000.00. However, Employee shall not be entitled to any compensation under this Section 2.(b.) if he/she voluntarily terminates their relationship with the Corporation or is summarily terminated for "cause" prior to sale.

### 3. SURVIVAL:

Both the Corporation and the Employee (the "Parties") understand and agree that should the attached Agreement or this Addendum or any parts thereto become unconstitutional, invalid, or unenforceable, the remainder of the Agreement or the remainder of this Addendum, or portions thereof, shall be deemed severable and shall remain in full force and effect.

### 4. CONTINUATION OF EMPLOYMENT:

Upon request by the Corporation, and Employee participating in the Bonus from Profit as described in Section 2 above, Employee agrees to remain employed in his/her current position for a time not to exceed eighteen (18) months from the date of a private sale. In the event that Employee voluntarily resigns or is terminated for cause, then all options or rights under sections two and three above are terminated except as provided in section ten (10) of this Addendum. All Other Income payments to Employee as described in Section two (2) above shall cease immediately if a private sale occurs and or/Employee is no longer employed by the Corporation.

### 5. VACATION TIME:

So long as Employee maintains a management position with Corporation, he/she shall be entitled to ten (10) business days of vacation each year or as Corporation Policy dictates which may be revised from time to time (as earned and more fully defined in the Corporation's Employee Handbook) and so long as Employee maintains and completes a minimum fifty (50) plus hour work week for each and every year. Employee may not use more than five (5) vacation days consecutively unless previously approved by the President of the Corporation. Employee shall also be entitled to the standard Corporation holidays and sick/personal leave policy procedures as described in the Employee Handbook.

### 6. PROPRIETARY RIGHTS:

Employee shall agree to execute and help (within reason) in acquiring all patent and trademark applications, or copyright protection of its Licensed Products and services. These endeavors shall be obtained at Corporation's sole expense. Employee shall assign all rights, title and interest in any program or product developed for Corporation while employed under the Agreement. Employee agrees to honor the Non-disclosure/Non-compete sections of the Agreement with regard to any product, service or project discussed, researched, marketed, and/or created by the Corporation or its affiliates and/or subsidiaries.

5/18/2005                                    2

## 7. DUTIES/OBLIGATIONS:

The Employee's duties shall include, but not be limited to the following:

a. Employee agrees to render his artistic and creative services to Corporation in the planning, creation, preparation and rendering of artwork for use on Corporation's Licensed Products;

b. Perform whatever duties the Corporation requests in the normal course of operating/conducting its business (it is expected that the Employee will participate at the Executive management level);

c. Attend any trade show(s), sales presentation(s), conference(s), business meeting(s), tournament(s), exposition(s), exhibition(s), personal appearance(s) or convention(s) as requested in furtherance of promoting, marketing, selling or offering the Licensed Products and services of the Corporation for sale and distribution.

It is understood that the principal duties of the Employee will be on behalf of the Corporation in the areas in which the Corporation operates and such other areas contingent thereto. The Employee agrees to devote Employee's best efforts to the performance of assigned duties for the Corporation on a full-time basis. Employee also agrees to abide by and fulfill those duties described in Exhibit "A" attached hereto and perform those functions as described in that project list as to be determined.

Moreover, Employee agrees to each and every condition and obligation as more fully and specifically described in the Trademark and Product License Agreement attached hereto as Exhibit "B".

## 8. HOURS:

Employee acknowledges and understands the demand and scope of the project that Employee is engaging in. The Corporation's expectation of Employee exceeds fifty plus (50+) "working" hours per week with weekends as needed. Employee acknowledges that he may be required to work hours beyond those described herein. Employee acknowledges the need to work during weekends or other "unconventional" hours as necessary. Essentially, the Employee agrees that in order to perform the duties of the Employee's position, Employee must be willing to take on responsibilities other than those described herein for the benefit of the Corporation. Employee agrees that Employee will provide coverage via cell phone for troubleshooting purposes during business operating hours when Employee is otherwise off-site or not on Corporation time.

## 9. HEALTH, DISABILITY AND LIFE INSURANCE BENEFITS:

The Corporation shall provide Employee the opportunity to participate in the Corporation's Health Insurance, Long-term/Short-term Disability, and Life Insurance benefits programs offered by the Corporation.

5/18/2005                                      3

10. <u>TERMINATION RIGHTS:</u>

If Employee is terminated without cause during the Term of the Agreement, Employee shall be entitled to those benefits described in Section Two (2) of this Addendum so long as employment is terminated within six (6) months prior to any form of Sale or Public Offering. Employee shall also be entitled to any other benefit due him/her at time of termination. Corporation shall pay any amounts due and owing to the Employee including, but not limited to items such as expenses, pay or bonuses in the normal course of business such that Employee experienced during his past experiences with the Corporation. In the event a sale transpires during this six month time period, the Employee shall be paid as the Corporation or other management employees are paid, Employee shall be bound for share distribution (if applicable) as other managers.

ANY NON-PERFORMANCE OF THOSE CONDITIONS AS DESCRIBED UNDER SECTION SIX OR SEVEN OF THIS ADDENDUM IS REASONS FOR IMMEDIATE TERMINATION OF THE EMPLOYEE FOR CAUSE.

The Parties, by executing below, agree to all terms and conditions in this Addendum to the Employment Agreement dated this same date. Employee recognizes that this is a legally binding document and understands that he/she should seek appropriate legal counsel when reviewing this document. Employee affirmatively acknowledges that he/she is not being induced to relocate and Employee understands that continued employment is based upon satisfactory Corporation Employment Performance Evaluations conducted at any time the Corporation feels appropriate and necessary.

| | | |
|---|---|---|
| _____ | _5/20/05_ | ~~Carey Chen~~ |
| Witness | Date | Carey Chen |
| _____ | _____ | _____ |
| Witness | Date | Cayman Arts, Inc. |

5/18/2005                                        4

## Schedule A

a. Employee agrees to render his artistic and creative services to Corporation in the planning, creation, preparation and rendering of artwork for use on Corporation's Licensed Products;

b. Employee agrees to render his artistic and creative services to Corporation in maintaining and expanding library of art and inventory of original art.

c. Perform whatever duties the Corporation requests in the normal course of operating/conducting its business (it is expected that the Employee will participate at the Executive management level);

c. Attend any trade show(s), sales presentation(s), conference(s), business meeting(s), tournament(s), exposition(s), exhibition(s), personal appearance(s) or convention(s) as requested in furtherance of promoting, marketing, selling or offering the Licensed Products and services of the Corporation for sale and distribution.

d. Assist corporation recruit and/or close any and all commission related projects.

e. Assist corporation with all tournament business including recruiting, networking and closing.

f. Be accessible for any and all public relations and marketing efforts.

g. Assist corporation on developing and improving trademark licensed products.

## EXHIBIT "B"

## TRADEMARK AND PRODUCT LICENSE AGREEMENT

This Trademark and Product License Agreement (the "Agreement"), made and entered into this _____ of _____, 2005, but effective as of September 1, 2004 (the "Effective Date"), by and between Carey Chen ("Licensor"), and Cayman Arts, Inc., a corporation organized under the laws of the State of Florida, with its principle place of business being 1507-A S. University Drive, Plantation, Florida 33324, ("Licensee"). Licensor and Licensee are each a "Party" and together "Parties" to this Agreement.

## WITNESSETH

WHEREAS, prior to the execution of this Agreement, Licensee purchased from Cayman Arts, LLC all the rights, title and interest to the Licensed Products of Cayman Arts, LLC including all works created, developed and designed by Licensor. As such, in consideration of the past, current and future employment of Licensor, and for all compensation granted to Licensor as described in the attached Employment Agreement and other good and valuable consideration, Licensor does hereby license and assign to Licensee for twenty (20) years from the Effective Date, any and all rights, title and interest that Licensor possesses in and to the Licensed Products, Trade Marks and Works (as defined in the Employment Agreement attached hereto) and any and all other artistic creation, including all copyrights in those existing original Works, Works in progress and future Works and any copies of Works derived therefrom, and Licensor will cooperate with Licensee in obtaining registration of the copyrights and recordation of the assignment of the Licensed Products, Trade Marks and Works as reasonably necessary.

WHEREAS, for twenty (20) years from the Effective Date of this Agreement, Licensor agrees that he shall be prohibited in any way from offering such Licensed Products, Trade Marks and Works to any third party, individual or entity without the express written consent of Licensee.

WHEREAS, however, although Licensor's employment may be terminated as described in the Employment Agreement and Addendum attached hereto, Licensee shall still retain all rights, title and interest through the grant of license by Licensor in those Product Marks for the entire twenty (20) year period as described in Section 7 of the Employment Agreement.

WHEREAS, Licensor is an accomplished artist specializing in saltwater fish renderings and other artistic designs and he possesses common law trademark rights in his artistic Works, renderings and other similarly related Works and has the legal right to use and to license the use of his artwork as hereinafter defined; and

WHEREAS, Licensor owns certain designs, marks, trademarks, brands, trade names and other proprietary rights associated with creation of artistic renderings, paintings and/or images including, but not limited to, the Carey Chen Collection and all products, renderings and images that are created, manufactured or rendered by Licensor himself, now or in the future, and the goodwill associated therewith, and any artwork, art graphics, trade

05/20/2005  14:26    9544244258              CAYMAN ARTS,INC                        PAGE  13/17

names, service marks, trade-marks, symbols, depictions or graphics, which collectively is the intellectual property, trademarks and property of Licensor (hereinafter collectively referred to as "Licensed Products", "Trade Marks" and Works"); and

WHEREAS, Licensor acknowledges that Licensee shall market, sell, promote, distribute and sublicense all Licensed Products, Trade Marks and Works for profit, and wishes to obtain a license for transferring certain renderings associated with the production of any type of good or service for tournament(s), exposition(s), exhibition(s), trade show(s), convention(s), and/or for private or retail sale and distribution; and

NOW, THEREFORE, and in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, including the consideration provided by Licensee, the adequacy and sufficiency of which are hereby acknowledged, the Parties hereby agree to the terms and conditions of this Agreement as herein-described.

     1.    DEFINITIONS. When used in this Agreement, the following terms shall have the meanings in this section:

     1.1    "Net Sales Price" shall mean Licensee's gross invoice price of Licensed Products to its customers, less any sales tax, freight costs and other transportation or operational charges;

     1.2    "Licensed Product(s)" shall mean any and all items containing Trademarks, Works or Marks manufactured, designed, developed, marketed, advertised, distributed, offered for sale and/or sold that are used by Licensee for creation or design of all kinds and character of items including, but not limited to, apparel, clothing, fixtures, goods, and any other tangible materials, logos or commodities;

     1.3    "Territory" shall mean the entire World.

     2.    GRANT OF LICENSE.

     2.1    The Licensor hereby grants to Licensee an unlimited, exclusive license to use the Licensed Products, Trade Marks and Works in connection with the manufacture, design, development, marketing, advertisement, distribution, offering for sale, distribution and sale of the Licensed Products and only so long as Licensee complies with all provisions of this Agreement. The rights granted to Licensee hereunder may be assigned, transferred or sublicensed by Licensee without the express written consent of the Licensor.

     3.    RECORDS.

     3.1    Licensee shall keep full, clear and accurate records with respect to the manufacture, sale and distribution of Licensed Products.

     4.    TRADEMARK RIGHTS – OWNERSHIP OF COPYRIGHT.

Licensor guarantees the exclusive ownership of the Licensed Products, Trade Marks and

Confidential and Proprietary  5/18/2005      2          Property of Cayman Arts, Inc.

48 of 73

Works worldwide and will defend, at their cost, the right of Licensee to use the Licensed Products, Trade Marks and Works throughout he world, provided that Licensee give Licensor written notice of any claim of infringement or objection to the use of the Licensed Products, Trade Marks and Works within a reasonable time of receipt of such claim.

    4.1    Licensee expressly recognizes the Licensor 's exclusive title to the Licensed Products, Trade Marks and Works and the goodwill associated with those Licensed Products, Trade Marks and Works, and shall not at any time do or permit to be done any action or thing that will in any way impair the rights of the Licensor in and to the Licensed Products, Trade Marks and Works. It is understood that Licensee shall not acquire and shall not claim any title to the Licensed Products, Trade Marks and Works adverse to the Licensor by virtue of the license granted to Licensee or through Licensee's use of the Licensed Products, Trade Marks and Works.

    4.3    Licensee, if requested by the Licensor, will execute and file, at the Licensor 's expense, applications for registration of any of the Licensed Products, Trade Marks and Works with regard to the Licensed Products and Licensee further expressly agrees that Licensee will, immediately upon filing any applications for registration of any of the Licensed Products, Trade Marks and Works, assign to the Licensor the applications and all rights and goodwill in the Licensed Products, Trade Marks and Works, as used on the Licensed Products.

    5.    __INDEMNIFICATION.__

    5.1    Licensor shall bear no responsibility or liability with respect to any claims, demands, actions, proceedings, judgments, penalties, losses, costs, damages, expenses or suits by third persons for damages incurred or suffered, resulting from, or caused by, the defective or allegedly defective manufacture, storage, use or transportation of Licensed Products covered by this Agreement, and Licensee shall indemnify and hold Licensor harmless from liability thereon. Licensee, likewise shall bear no responsibility or liability with respect to any claims, demands, actions, proceedings, judgments, penalties, losses, costs, damages, expenses or suits by third parties for damages incurred or suffered, resulting from, or caused by, any act, omission, obligation or promises by Licensor covered by this Agreement, and Licensor shall indemnify and hold Licensee harmless from liability thereon.

    6.    __TERM AND TERMINATION.__

    6.1    This Agreement shall become effective as of the Effective Date, and shall continue in force and effect, unless sooner terminated, as provided herein, for a period of twenty (20) years (the "Term").

    6.2    The terms of this Agreement and any subsequent renewal periods (if any) shall be the same as herein set forth, unless otherwise amended in writing by the Parties hereto.

    6.3    This Agreement may be terminated prior to the completion of the Term or any renewal thereof only by mutual written consent of each Party hereto, or if Licensee has exercised its good faith efforts in promoting and selling Product Marks and has

Confidential and Proprietary  5/18/2005      3          Property of Cayman Arts, Inc.

reasonably demonstrated to Licensor that there is a lack of market acceptance for the Licensed Products, one hundred and twenty (120) days after Licensee provided Licensor with written notice of its intent to terminate.

6.4     Effects of Termination.  Upon the termination of this Agreement: (a) all rights granted to Licensee hereunder shall terminate and automatically revert to Licensor; and (b) Licensee agrees to immediately: (1) discontinue all use of Licensed Products, Trade Marks and Works and any term confusingly similar thereto, including but not limited to all use of any Product Mark, Trademark or Mark as part of the Licensee's trade or in connection with any Licensed Products or any other products sold by Licensee; (2) destroy all advertising, packaging, promotional and other written materials bearing any Trademark or Mark; and (3) upon the request of Licensor, take any and all actions necessary to evidence and effectuate the termination of Licensee's use of any Trademark or Mark and any name confusingly similar thereto, including, but not limited to, preparing, executing, filing and delivering any and all documents necessary for the cancellation of any fictitious business name statements, if any, previously filed by Licensee for the use of any Trademark or Mark. Termination of this Agreement shall be without prejudice to either parties' remedies for any breach which has not been cured as of the termination.

6.5     In such case as Licensee decides that it shall abandon or dissolve Cayman Arts, Inc., following such dissolution or abandonment and on the advisement by the Directors of Cayman Arts, Inc. that the Company is no longer a viable method of productivity, the Directors of Cayman Arts, Inc. shall release Licensor from the Trademark and License commitment in this Agreement so long as prior to the end of the Term Licensee receives from Licensor the following schedule of payments:

6.5.1.  For the first three years from date of official/formal dissolution or Abandonment, the Directors of Licensee shall receive fifty (50) percent of all gross fees or income generated;

6.5.2.  For the next three years the Directors of Licensee shall receive thirty-five (35) percent of all gross fees or income generated;

6.5.3.  For the next three years the Directors of Licensee shall receive twenty-five (25) percent of all gross fees or income generated; and

6.5.4.  For any remaining years prior to the end of the Term of this Agreement, the Directors of Licensee shall receive ten (10) percent of all gross fees or income generated.

7.     DUTIES AND RESPONSIBILITIES; BEST EFFORTS.

7.1     Both Parties shall cooperate with each other and use their best efforts in connection with the distribution, sale and offering for sale of the Licensed Products in order to maximize sales of the Licensed Products. Such best efforts shall be exerted to develop, produce and market the Licensed Products on and/or in connection with which Licensee may use such Licensed Products, Trade Marks and Works, and to build an association with any other products on or in connection with which Licensor may use such Licensed Products, Trade Marks and Works, thereby establishing a total marketing package in which each item thereof compliments each other item thereof. In the event that a personal appearance of Carey Chen is requested by Licensee, Licensor and Licensee agree that all requests for

Confidential and Proprietary  5/18/2005        4             Property of Cayman Arts, Inc.

appearance shall be made on reasonable terms and at the discretion of Cayman Arts, Inc., and that all expenses associated with such travel shall be incurred as described in the Corporation Travel and Entertainment Expense Handbook by Cayman arts, Inc.

Licensor's employees' creative talents with artwork require hands-on attention to make this Joint Effort successful. Accordingly, Licensor warrants, covenants and agrees to continuously create additional artwork and oversee the creation of artwork from third parties that will benefit and supplement the Licensed Product Mark line. Additionally, it is further agreed that Licensee shall also have the right and authority to source or supply artwork for use in this line of Licensed Products. Licensor further covenants that any such artwork that it creates or is provided by third parties and overseen by Licensor, will not infringe upon or impair the rights of any other artists or third parties, and Licensor shall indemnify and hold Licensee harmless from liability thereon.

8.      MISCELLANEOUS.

8.1     If any portion of this Agreement is found to be void or unenforceable, the remaining portion hereof shall be binding and shall be enforced with the same effect as though the void or unenforceable portions were deleted.

8.2     This Agreement contains the entire and only understanding of the Parties hereto. No change, modification, extension, renewal, rescission, termination, discharge or waiver of this Agreement or any of the provisions hereof nor any representation, promise or condition relating to this Agreement shall be binding upon the Parties unless made, in writing, and signed by their duly authorized representative.

8.3     All notices required to be given under this Agreement shall be in writing and shall be valid and sufficient only if sent by certified mail, return receipt requested, or delivered in person by overnight carrier, by either Party to the other to the following addresses:

If to Licensor:          Carey Chen
                         _____
                         _____

If to Licensee:          Cayman Arts, Inc.
                         c/o Scott Steele
                         5700 Executive Drive
                         Baltimore, Maryland 21228

Either Party hereto may change its address by a notice given to the other in the manner set forth above.

8.4     This Agreement shall be deemed to be made in, enforced under, and governed by and construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, this Agreement has been executed by the duly authorized

Confidential and Proprietary  5/18/2005          5              Property of Cayman Arts, Inc.

representatives of the Parties hereto as of the date first written.

Carey Chen

_____          _____
Witness

Cayman Arts, Inc.

_____          BY:_____ (Licensee)
Witness                          Printed Name:_____

                                 Title:_____

Confidential and Proprietary  5/18/2005        6          Property of Cayman Arts, Inc.

52 of 73

## EXHIBIT "B"

## TRADEMARK AND PRODUCT LICENSE AGREEMENT

This Trademark and Product License Agreement (the "Agreement"), made and entered into this _____ of _____, 2005, but effective as of September 1, 2004 (the "Effective Date"), by and between Carey Chen ("Licensor"), and Cayman Arts, Inc., a corporation organized under the laws of the State of Florida, with its principle place of business being 1507-A S. University Drive, Plantation, Florida 33324, ("Licensee"). Licensor and Licensee are each a "Party" and together "Parties" to this Agreement.

## WITNESSETH

WHEREAS, prior to the execution of this Agreement, Licensee purchased from Cayman Arts, LLC all the rights, title and interest to the Licensed Products of Cayman Arts, LLC including all works created, developed and designed by Licensor.  As such, in consideration of the past, current and future employment of Licensor, and for all compensation granted to Licensor as described in the attached Employment Agreement and other good and valuable consideration, Licensor does hereby license and assign to Licensee for twenty (20) years from the Effective Date, any and all rights, title and interest that Licensor possesses in and to the Licensed Products, Trade Marks and Works (as defined in the Employment Agreement attached hereto) and any and all other artistic creation, including all copyrights in those existing original Works, Works in progress and future Works and any copies of Works derived therefrom, and Licensor will cooperate with Licensee in obtaining registration of the copyrights and recordation of the assignment of the Licensed Products, Trade Marks and Works as reasonably necessary.

WHEREAS, for twenty (20) years from the Effective Date of this Agreement, Licensor agrees that he shall be prohibited in any way from offering such Licensed Products, Trade Marks and Works to any third party, individual or entity without the express written consent of Licensee.

WHEREAS, however, although Licensor's employment may be terminated as described in the Employment Agreement and Addendum attached hereto, Licensee shall still retain all rights, title and interest through the grant of license by Licensor in those Product Marks for the entire twenty (20) year period as described in Section 7 of the Employment Agreement.

WHEREAS, Licensor is an accomplished artist specializing in saltwater fish renderings and other artistic designs and he possesses common law trademark rights in his artistic Works, renderings and other similarly related Works and has the legal right to use and to license the use of his artwork as hereinafter defined; and

WHEREAS, Licensor owns certain designs, marks, trademarks, brands, trade names and other proprietary rights associated with creation of artistic renderings, paintings and/or images including, but not limited to, the Carey Chen Collection and all products, renderings and images that are created, manufactured or rendered by Licensor himself, now or in the future, and the goodwill associated therewith, and any artwork, art graphics, trade

EXHIBIT

D

names, service marks, trade-marks, symbols, depictions or graphics, which collectively is the intellectual property, trademarks and property of Licensor (hereinafter collectively referred to as "Licensed Products", "Trade Marks" and Works"); and

WHEREAS, Licensor acknowledges that Licensee shall market, sell, promote, distribute and sublicense all Licensed Products, Trade Marks and Works for profit, and wishes to obtain a license for transferring certain renderings associated with the production of any type of good or service for tournament(s), exposition(s), exhibition(s), trade show(s), convention(s), and/or for private or retail sale and distribution; and

NOW, THEREFORE, and in consideration of the mutual promises contained in this Agreement and for other good and valuable consideration, including the consideration provided by Licensee, the adequacy and sufficiency of which are hereby acknowledged, the Parties hereby agree to the terms and conditions of this Agreement as herein-described.

1.    DEFINITIONS. When used in this Agreement, the following terms shall have the meanings in this section:

1.1    "Net Sales Price" shall mean Licensee's gross invoice price of Licensed Products to its customers, less any sales tax, freight costs and other transportation or operational charges;

1.2    "Licensed Product(s)" shall mean any and all items containing Trademarks, Works or Marks manufactured, designed, developed, marketed, advertised, distributed, offered for sale and/or sold that are used by Licensee for creation or design of all kinds and character of items including, but not limited to, apparel, clothing, fixtures, goods, and any other tangible materials, logos or commodities;

1.3    "Territory" shall mean the entire World.

2.    GRANT OF LICENSE.

2.1    The Licensor hereby grants to Licensee an unlimited, exclusive license to use the Licensed Products, Trade Marks and Works in connection with the manufacture, design, development, marketing, advertisement, distribution, offering for sale, distribution and sale of the Licensed Products and only so long as Licensee complies with all provisions of this Agreement.  The rights granted to Licensee hereunder may be assigned, transferred or sublicensed by Licensee without the express written consent of the Licensor.

3.    RECORDS.

3.1    Licensee shall keep full, clear and accurate records with respect to the manufacture, sale and distribution of Licensed Products.

4.    TRADEMARK RIGHTS – OWNERSHIP OF COPYRIGHT.

Licensor guarantees the exclusive ownership of the Licensed Products, Trade Marks and

Works worldwide and will defend, at their cost, the right of Licensee to use the Licensed Products, Trade Marks and Works throughout the world, provided that Licensee give Licensor written notice of any claim of infringement or objection to the use of the Licensed Products, Trade Marks and Works within a reasonable time of receipt of such claim.

4.1    Licensee expressly recognizes the Licensor's exclusive title to the Licensed Products, Trade Marks and Works and the goodwill associated with those Licensed Products, Trade Marks and Works, and shall not at any time do or permit to be done any action or thing that will in any way impair the rights of the Licensor in and to the Licensed Products, Trade Marks and Works. It is understood that Licensee shall not acquire and shall not claim any title to the Licensed Products, Trade Marks and Works adverse to the Licensor by virtue of the license granted to Licensee or through Licensee's use of the Licensed Products, Trade Marks and Works.

4.3    Licensee, if requested by the Licensor, will execute and file, at the Licensor's expense, applications for registration of any of the Licensed Products, Trade Marks and Works with regard to the Licensed Products and Licensee further expressly agrees that Licensee will, immediately upon filing any applications for registration of any of the Licensed Products, Trade Marks and Works, assign to the Licensor the applications and all rights and goodwill in the Licensed Products, Trade Marks and Works, as used on the Licensed Products.

5.    INDEMNIFICATION.

5.1    Licensor shall bear no responsibility or liability with respect to any claims, demands, actions, proceedings, judgments, penalties, losses, costs, damages, expenses or suits by third persons for damages incurred or suffered, resulting from, or caused by, the defective or allegedly defective manufacture, storage, use or transportation of Licensed Products covered by this Agreement, and Licensee shall indemnify and hold Licensor harmless from liability thereon. Licensee, likewise shall bear no responsibility or liability with respect to any claims, demands, actions, proceedings, judgments, penalties, losses, costs, damages, expenses or suits by third parties for damages incurred or suffered, resulting from, or caused by, any act, omission, obligation or promises by Licensor covered by this Agreement, and Licensor shall indemnify and hold Licensee harmless from liability thereon.

6.    TERM AND TERMINATION.

6.1    This Agreement shall become effective as of the Effective Date, and shall continue in force and effect, unless sooner terminated, as provided herein, for a period of twenty (20) years (the "Term").

6.2    The terms of this Agreement and any subsequent renewal periods (if any) shall be the same as herein set forth, unless otherwise amended in writing by the Parties hereto.

6.3    This Agreement may be terminated prior to the completion of the Term or any renewal thereof only by mutual written consent of each Party hereto, or if Licensee has exercised its good faith efforts in promoting and selling Product Marks and has

Confidential and Proprietary  5/18/2005        3            Property of Cayman Arts, Inc.

reasonably demonstrated to Licensor that there is a lack of market acceptance for the Licensed Products, one hundred and twenty (120) days after Licensee provided Licensor with written notice of its intent to terminate.

6.4     Effects of Termination. Upon the termination of this Agreement: (a) all rights granted to Licensee hereunder shall terminate and automatically revert to Licensor; and (b) Licensee agrees to immediately: (1) discontinue all use of Licensed Products, Trade Marks and Works and any term confusingly similar thereto, including but not limited to all use of any Product Mark, Trademark or Mark as part of the Licensee's trade or in connection with any Licensed Products or any other products sold by Licensee; (2) destroy all advertising, packaging, promotional and other written materials bearing any Trademark or Mark; and (3) upon the request of Licensor, take any and all actions necessary to evidence and effectuate the termination of Licensee's use of any Trademark or Mark and any name confusingly similar thereto, including, but not limited to, preparing, executing, filing and delivering any and all documents necessary for the cancellation of any fictitious business name statements, if any, previously filed by Licensee for the use of any Trademark or Mark. Termination of this Agreement shall be without prejudice to either parties' remedies for any breach which has not been cured as of the termination.

6.5     In such case as Licensee decides that it shall abandon or dissolve Cayman Arts, Inc., following such dissolution or abandonment and on the advisement by the Directors of Cayman Arts, Inc. that the Company is no longer a viable method of productivity, the Directors of Cayman Arts, Inc. shall release Licensor from the Trademark and License commitment in this Agreement so long as prior to the end of the Term Licensee receives from Licensor the following schedule of payments:

> 6.5.1.  For the first three years from date of official/formal dissolution or Abandonment, the Directors of Licensee shall receive fifty (50) percent of all gross fees or income generated;
> 6.5.2.  For the next three years the Directors of Licensee shall receive thirty-five (35) percent of all gross fees or income generated;
> 6.5.3.  For the next three years the Directors of Licensee shall receive twenty-five (25) percent of all gross fees or income generated; and
> 6.5.4.  For any remaining years prior to the end of the Term of this Agreement, the Directors of Licensee shall receive ten (10) percent of all gross fees or income generated.

## 7.     DUTIES AND RESPONSIBILITIES: BEST EFFORTS.

7.1     Both Parties shall cooperate with each other and use their best efforts in connection with the distribution, sale and offering for sale of the Licensed Products in order to maximize sales of the Licensed Products. Such best efforts shall be exerted to develop, produce and market the Licensed Products on and/or in connection with which Licensee may use such Licensed Products, Trade Marks and Works, and to build an association with any other products on or in connection with which Licensor may use such Licensed Products, Trade Marks and Works, thereby establishing a total marketing package in which each item thereof compliments each other item thereof. In the event that a personal appearance of Carey Chen is requested by Licensee, Licensor and Licensee agree that all requests for

appearance shall be made on reasonable terms and at the discretion of Cayman Arts, Inc., and that all expenses associated with such travel shall be incurred as described in the Corporation Travel and Entertainment Expense Handbook by Cayman arts, Inc.

Licensor's employees' creative talents with artwork require hands-on attention to make this Joint Effort successful. Accordingly, Licensor warrants, covenants and agrees to continuously create additional artwork and oversee the creation of artwork from third parties that will benefit and supplement the Licensed Product Mark line.  Additionally, it is further agreed that Licensee shall also have the right and authority to source or supply artwork for use in this line of Licensed Products.  Licensor further covenants that any such artwork that it creates or is provided by third parties and overseen by Licensor, will not infringe upon or impair the rights of any other artists or third parties, and Licensor shall indemnify and hold Licensee harmless from liability thereon.

### 8.     MISCELLANEOUS.

8.1     If any portion of this Agreement is found to be void or unenforceable, the remaining portion hereof shall be binding and shall be enforced with the same effect as though the void or unenforceable portions were deleted.

8.2     This Agreement contains the entire and only understanding of the Parties hereto.  No change, modification, extension, renewal, rescission, termination, discharge or waiver of this Agreement or any of the provisions hereof nor any representation, promise or condition relating to this Agreement shall be binding upon the Parties unless made, in writing, and signed by their duly authorized representative.

8.3     All notices required to be given under this Agreement shall be in writing and shall be valid and sufficient only if sent by certified mail, return receipt requested, or delivered in person by overnight carrier, by either Party to the other to the following addresses:

If to Licensor:           Carey Chen

                          _____

                          _____

If to Licensee:           Cayman Arts, Inc.
                          c/o Scott Steele
                          5700 Executive Drive
                          Baltimore, Maryland 21228

Either Party hereto may change its address by a notice given to the other in the manner set forth above.

8.4     This Agreement shall be deemed to be made in, enforced under, and governed by and construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, this Agreement has been executed by the duly authorized

Confidential and Proprietary   5/18/2005        5           Property of Cayman Arts, Inc.

representatives of the Parties hereto as of the date first written.

Carey Chen

_____          _____
Witness

Cayman Arts, Inc.

_____          BY:_____ (Licensee)
Witness                            Printed Name:_____

                                   Title:_____

Confidential and Proprietary   5/18/2005        6           Property of Cayman Arts, Inc.

September 11, 2009

Scott Steele
5700 Executive Drive
Baltimore, MD 21228

Dear Scott:

  As you know, in 2005, we entered into a set of agreements (the "Agreements"), including an Employment Agreement ("Employment Agreement") and a Trademark and Product License Agreement ("License Agreement"), pursuant to which Cayman Arts Inc. ("Cayman") was required to fulfill various obligations. Cayman has not met its contractual and other obligations. Cayman is in material breach and, as a consequence, my obligations under the Agreements are relieved.

  I flew to Maryland at my own expense and met with you on July 22, 2009 and provided you with notice of my termination of the Employment Agreement. In response you told me that you wanted me out of the house. You also left a message that you intended to come to Florida to speak with me further, but that has not happened. I wish to confirm that over the holiday weekend, I complied with your prior demand, removed my belongings from the house and turned over the keys to Cayman Arts.

  As an accommodation to you, I will continue to perform my duties and responsibilities within the course and scope of my position with Cayman, for the next thirty (30) days, through October 11, 2009, for my regular compensation. Should you wish my termination effective immediately please notify.

  In view of the foregoing and other factors, the Agreements are terminated. I would like to have a smooth transition with both Cayman and you, personally during this transition period. I remain available to cooperate with you and would appreciate your cooperation as well.

  Should you or your attorneys have any questions or require any additional information, please contact my attorney, Steve Schwarzberg, Esq. at 561-695-3300. Thank you.

  Nothing contained in or omitted from this document is intended or shall be considered to be a waiver or admission of any kind. All rights are reserved.

Sincerely yours,

Carey Chen

cc: Steven L. Schwarzberg, Esq.

1

EXHIBIT

tabbies

E

## CONFESSED JUDGMENT NOTE

**$__17,000.00**                                    _June 10, 2005_(Date)

The undersigned Payor promises to pay to the order of Scott R. Steele ("Payee") the sum of seventeen thousand even dollars ($17,000.00) ("Principal Sum"), together with interest of 8.0% per annum on the unpaid balance amortized over a five year period. The entire principal and any accrued interest shall be fully and immediately payable in accordance with the following:

1.      Unless sooner paid, beginning on  June 10, 2005, Payor agrees to pay Payee a payment of _____ dollars ($_____.00) per pay period (every two weeks), 26 installments per year, for three consecutive years until paid in full.  For each payment collected, Payor affirmatively agrees and authorizes that Payee deduct such semi-monthly amount from Payor's payroll wages at the exact time and date that such wages are usually and normally paid to the Payee's employees (either in person or automatically credited to Payors' bank account) and after all applicable taxes, health and/or other expenses are paid, distributed or deducted in the present normal course.  In the event that Payor leaves the employ of Payee or Cayman Arts, Inc. prior to the debt being repaid for whatever reason, Payor affirmatively agrees to remit payment to Payee on the first and fifteenth days of each month beginning with the first full month following separation from the Payee or company until paid in full.  Payor agrees to pay the full balance of the indebtedness plus interest at the rate described above by June 10, 2010.

2.      This Note shall immediately become due and payable at the option of the holder in the event of any default or anticipated default of any obligation on the part of the undersigned; the death of the undersigned; any application for the appointment of a receiver for, or any assignment for the benefit of creditors by, or in the institution of any insolvency proceedings concerning, or any act of bankruptcy by the undersigned; the issuance of any attachment or entry of judgment against the undersigned; or any change in the financial condition of the undersigned which in the judgment of the holder materially increases its risks hereunder.

3.      The undersigned Parties hereby authorize any attorney designated by the holder, to the full extent permitted by law, to appear for the undersigned Parties in any court of record in the State of Maryland or elsewhere, and waive the issuance and service of process and to enter a judgment against the undersigned Payor in favor of the holder of this Note for such sum or sums as may be payable hereunder, pre or post judgment interest, together with the costs of any action and attorney's fees as applicable. The undersigned Payor hereby



EXHIBIT

_F_

waives and releases all errors in said proceedings, any right of appeal or exception from the judgment entered, stay of execution, and the exemption of property from levy and sale on any execution, and agrees that any real estate may be sold on a writ of execution or otherwise in fulfillment of the outstanding debt.

4.      The undersigned Payor and all endorsers hereof waive presentment, demand for payment, notice of dishonor, protest and notice of protest and all other notices and demands in connection herewith, and agree that the liability of each of the undersigned shall be unconditional without regard to the liability of any other party and shall not be affected by any indulgence, renewal, waiver, release or other modification granted or consented to by the holder hereof.

5.      Upon default as described herein, and providing this note is turned over for internal or external collection, the undersigned Payor agrees to pay all reasonable legal fees, costs of collection, and pre and post judgment interest (as applicable) to the extent permitted by law.

The obligations and liability of every party who signs this Note, whether as borrower or co-maker and whether originally or by being added hereto shall be joint and several.

Notary signature:

_____

_____

_____
Print name and address of Notary.

_____ (SEAL)
Carey Chen (Payor)
SSN:
_____

_____
Address

_____
Phone number



EXHIBIT
tabbies
Composite
G

Carey Chen



**Carey Chen Boat Wraps Now Available**
> Wrap your boat in Carey Chen art and stand
out in any body of water. Use Carey Chen art
for your boat wrap.

Learn More...

**QUICK NAV**     • jump to

**MAILING LIST**

Join

Carey Chen



**Carey Chen Boat Wraps Now Available**
> Wrap your boat in Carey Chen art and stand
  out in any body of water. Use Carey Chen art
  for your boat wrap.

Learn More...

Carey Chen



Carey Chen Boat Wraps Now Available

> Wrap your boat in Carey Chen art and stand
out in any body of water. Use Carey Chen art
for your boat wrap.

Learn More...

QUICK NAV    • jump to

MAILING LIST

Join



**Carey Chen Boat Wraps Now Available**

> Wrap your boat in Carey Chen art and stand out in any body of water. Use Carey Chen art for your boat wrap.

Learn More...

■ QUICK NAV • jump to

■ MAILING LIST

Join

Carey Chen



**Carey Chen Boat Wraps Now Available**
> Wrap your boat in Carey Chen art and stand
  out in any body of water. Use Carey Chen art
  for your boat wrap.

Learn More...

QUICK NAV • jump to

MAILING LIST

Join

Carey Chen











Carey Chen















http://www.careychen2.com/commissions.html

2/10/2010

Carey Chen













TOURNAMENTS    CUSTOM APPAREL    FORUM    ARTIST BIO    NEWS    LINKS

http://www.careychen2.com/commissions.html

2/10/2010



**Carey Chen Boat Wraps Now Available**

> Wrap your boat in Carey Chen art and stand out in any body of water. Use Carey Chen art for your boat wrap.

Learn More...

■ QUICK NAV   • jump to

■ MAILING LIST

Join

Carey Chen











**Carey Chen Boat Wraps Now Available**
> Wrap your boat in Carey Chen art and stand out in any body of water. Use Carey Chen art for your boat wrap.

Learn More...

▪ QUICK NAV        • jump to

▪ MAILING LIST                    [ Join ]

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)    **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

FILED by _____ D.C.

ELECTRONIC

**Feb. 12, 2010**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## I. (a) PLAINTIFFS

Chen, Carey

**DEFENDANTS**

Cayman Arts, Inc., a Florida corporation

**(b)** County of Residence of First Listed Plaintiff  **Palm Beach**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Schwarzberg & Associates
222 Lakeview Avenue, Suite 210
West Palm Beach, Florida 33401

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☑ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
  Plaintiff

☑ 3  Federal Question
  (U.S. Government Not a Party)

☐ 2  U.S. Government
  Defendant

☐ 4  Diversity
  (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☑ 4 |
| Citizen of Another State | ☐ 2 | ☑ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☒ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Re-filed- (see VI below)  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions second page):

a) Re-filed Case ☐ YES ☑ NO    b) Related Cases ☐ YES ☑ NO

JUDGE _____    DOCKET NUMBER _____

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (**Do not cite jurisdictional statutes unless diversity**):

LANHAM ACT CLAIM – §15 U.S.C. 1125(a)(1) and FLSA 29 U.S.C. §201 et seq. (29 U.S.C. §216(b))

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND: ☑ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD    _Steve S__

DATE  2/12/10

FOR OFFICE USE ONLY

AMOUNT  350⁰⁰    RECEIPT # 7210845    IFP _____